The CAMBRIDGE FUND, INC.,
Plaintiff,

v.

Frank J. ABELLA, Jr., Robert Fredricks,
University Capital Corporation and University Management Corp., Defendants.

No. 75 Civ. 3474 (CES).

United States District Court,
S. D. New York.

July 29, 1980.
As Amended Aug. 19, 1980.

**600**

Reavis & McGrath, New York City by David C. Birdoff, Joseph P. Zammit, and James C. Sweeney, New York City, for plaintiff.

Putney, Twombly, Hall & Hirson, New York City by Donald Stuart Bab, New York City, for defendants Frank J. Abella, Jr.,

University Capital Corporation, and University Management Corp.

Kane, Kessler, Proujansky, Preiss & Nurnberg, P.C., New York City by Albert N. Proujansky, New York City, for defendant Robert Fredricks.

## OPINION

STEWART, District Judge:

The action was tried to this court, without a jury, on nine trial days, commencing July 23, 1979 and ending August 17, 1979. This opinion constitutes our findings of fact and conclusions of law.

## I. PLAINTIFF'S CLAIMS

Plaintiff, the Cambridge Fund, Inc. [the "Fund"], seeks in Counts One and Five of its complaint to recover from defendants Frank J. Abella, Jr., University Management Corporation ["Management"] and University Capital Corporation ["Capital"], [collectively the "Abella defendants"], and from defendant Robert Fredricks, for certain monies paid by the Fund to Management and Abella as indemnification for legal expenses incurred in connection with a Securities and Exchange Commission ["SEC"] administrative proceeding, and to recover from defendant Abella for certain monies paid to the law firm of Kass, Goodkind, Wechsler & Gerstein ["Kass, Goodkind"] for legal expenses incurred in connection with an SEC investigation [the "legal expenses claim"]. The Fund also seeks in Count Four of its complaint to recover from Abella for certain transactions by him and members of his immediate family in securities which plaintiff alleges were simultaneously being bought, sold or held by the Fund [the "joint-trading claim"]. Plaintiff alleges that defendants violated Sections 17, 36 and 37 of the Investment Company Act of 1940 ["the Act"], 15 U.S.C. §§ 80a–17, 80a–35 and 80a–36; Rule 17d–1, 17 C.F.R. § 270–17d–1; and the common law.[1] Count Three was dismissed after defendants moved for summary judgment and

Counts Two and Six were dismissed upon the motion of plaintiff.

## A. FINDINGS OF FACT

### 1. The Legal Expenses Claims

The relevant events begin in late 1968 when the plaintiff Fund was formed. Tr. at 560–563. The Fund, a Delaware corporation, is a publicly held, closed–end, nondiversified, management investment company registered with the SEC pursuant to the provisions of the Act. P.T.O. ¶ 1. At the time of the initial public offering of its shares in January, 1969, the Fund was known as "The Jaffee Fund, Inc.": Wilton Jaffee was its president and a director; Stanley DuBoff was Secretary and a director; Howard Herman was Treasurer; and Stuart D. Wechsler, of the law firm of Kass, Goodkind, was a director. P.T.O. ¶¶ 2, 3, 12–15. The adviser to the Fund at that time was Jaffee Management Company, Inc.: Jaffee was director, president and sole stockholder of Jaffee Management Company, Inc.; DuBoff was Secretary and a director, and Herman was Treasurer. P.T.O. ¶¶ 4, 5, 12 and 13. The Fund was Jaffee Management Company, Inc.'s sole client. P.T.O. ¶ 9. Defendant Frank Abella was employed in 1969 by Jaffee Management Company, Inc. as the portfolio manager for the Fund. Id. Prior thereto he had been employed by Union Carbide Corp. ["Union Carbide"]. P.T.O. ¶ 11. As portfolio manager, his duties included analyzing corporations to ascertain whether the purchase of their securities should be recommended to the Fund by Jaffee Management Company, Inc., and making recommendations to Jaffee Management Company, Inc.'s officers concerning purchases of such securities by the Fund. Id.

By an agreement dated November 9, 1970, Jaffee agreed to sell all the outstanding stock of Jaffee Management Company, Inc. to defendant Capital, a New Jersey corporation wholly owned by defendant Frank Abella. P.T.O. ¶ 6. Wechsler repre-

---

**1.** We have jurisdiction over the claims in Counts One, Four and Five, under Section 44 of the Act and under principles of pendent jurisdiction of state law claims.

sented Abella in the acquisition of the management company. Tr. 170–172. The agreement provided, in part, that Jaffee would sell the shares "for the consideration of one dollar with additional consideration of $5,000 to be payable only in the event the net assets of the Fund equals the receipt of $7.50 per share as of the last day of any quarter during the next five years." Tr. at 144; Plaintiff's Exhibit 61. Capital, in fact, paid $2,501 to Jaffee for the purchase of Jaffee Management Company, Inc. Tr. at 469. In November, 1970, Abella became Secretary and Treasurer of Jaffee Fund, and Treasurer and a director of Jaffee Management Company, Inc., while Herman, DuBoff and Wechsler relinquished their respective positions. P.T.O. ¶¶ 10, 12–14.

At an annual meeting of the shareholders of the Fund on February 5, 1971, the Fund's name was changed to the Cambridge Fund, Inc. The shareholders elected defendant Abella and Dr. Marvin Moser, John F. Galbraith and John Powers as directors of the Fund; the latter two had been co-workers with Abella at Union Carbide, and although neither had previously served as an officer or director of a corporation and neither had any special expertise in the area of investments, they had been asked to serve as directors because the Fund was going to focus upon "technologically based" companies and Galbraith had experience investigating and evaluating small companies for Union Carbide "both technologically and financially", while Powers had been engaged, for approximately 10 to 15 years with evaluating technical projects for Union Carbide to determine whether there was a business relevancy. Tr. at 19–20, 72–74. The directors then elected defendant Frank Abella as President and Treasurer of the Fund, and Mary Ann Abella, defendant Frank Abella's wife, as Secretary of the Fund. P.T.O. ¶¶ 16, 19, 20. The law firm of Kass, Goodkind also became general counsel to the Fund. P.T.O. ¶ 15. In February, 1971, the name of Jaffee Management Company, Inc. was also changed to University Management Corporation and defendant Abella became president and a director of Management. P.T.O. ¶¶ 6, 10.

In 1971, the SEC commenced an investigation into possible violations by Jaffee Management Company, Inc., Wilton Jaffee, Howard Herman, Stanley DuBoff and Frank Abella, of the Investment Company Act of 1940, the Investment Advisers Act of 1940 and the Securities and Exchange Act of 1934, in connection with certain portfolio transactions of the Fund during the period from March, 1969 through May, 1970. P.T.O. ¶ 23. The SEC was investigating the purchase by the Fund of certain securities from Jaffee & Co. a brokerage firm in which Jaffee and Herman were partners and DuBoff a registered representative. P.T.O. ¶¶ 4, 12, 13, 32. The SEC was investigating possible violations of statutory provisions which prohibited "principal transactions between a registered investment company and its affiliate and prohibits a Fund from purchasing securities during the existence of an underwriting from any affiliate which is the principal underwriter of the issuer". P.T.O. ¶ 31.

Abella was subpoenaed in connection with this investigation. P.T.O. 26, tr. at 473. Abella testified before the SEC for the first time on August 17, 1971. At that time he was accompanied by Mr. Wechsler. The SEC transcript dated August 17, 1971, read into the record at trial, indicates that the following colloquy occurred at the beginning of the hearing between Mr. Lanzotti the SEC investigator, and Mr. Wechsler:

"[MR. LANZOTTI:] Are you representing the Fund, Mr. Wechsler, or are you representing Mr. Abella personally?

"MR. WECHSLER: At this time I am representing Mr. Abella personally for the purpose of this hearing and Mr. Abella.

"MR. LANZOTTI: The difficulty, Stuart–

"MR. WECHSLER: Go off the record.

"MR. LANZOTTI: I would like, Mr. Wechsler, an answer on the record.

"Are you representing Mr. Abella personally or would you like to discuss this with your client prior to replying to my question?

"MR. WECHSLER: I am representing Mr. Abella personally. The question in my own mind at this point am I also representing Mr. Abella, management company. The management company and the Fund but at this time Frank, I am representing you as a witness here personally."

Kass, Goodkind submitted to the Fund (directed to the attention of Mr. Abella, tr. at 180) a "statement for services rendered" dated February 11, 1972 in the amount of $6,037.32 which included charges for "services and advice with respect to private SEC investigation, including research, numerous conferences with Mr. Abella and David Butowsky [counsel for Mr. Jaffee], attendance at Mr. Abella's SEC testimony and review of the transcripts". Plaintiff's Exhibit 20. This billing was apparently based on a time record sheet (Plaintiff's Exhibit 23) that had initially indicated that Abella and Management were the clients, Tr. at 178. Their names were crossed out and "Fund" was listed as the client. The Fund issued a check for this amount dated April 24, 1972 made payable to Kass, Goodkind. Plaintiff's Exhibit 22. The parties submitted to us the minutes of two regular board meetings held during this period. The first is the minutes of the meeting held on February 4, 1972 (Defendants' Exhibit P) which contains the following reference to the SEC investigation:

Dr. Moser then reported on the testimony he had given in connection with the Commission's continuing investigation into the affairs of the Corporation and certain of its former officers and directors. There ensued a discussion of some of the problems in which the Commission appeared to be most interested. The directors questioned Dr. Moser, and Messrs. Abella and Wechsler concerning some of these areas of investigation. In particular, it was noted that the Commission seemed to be focusing a good deal of its attention on the activities of Wilton Jaffee, Howard Herman and Stanley Du-Boff, and on possible transactions with Jaffee and Co.

*Id.* at 5. At this meeting Dr. Moser also submitted his resignation. *Id.* The second is the next meeting held on March 28, 1972 (Plaintiff's Exhibit 6, see at p. 2) which contained the following reference to the SEC investigation:

Mr. Wechsler then discussed the S.E.C.'s continuing private investigation into the affairs of the Corporation. Mr. Wechsler had given testimony with respect to the investigation subsequent to the prior Meeting of the Board of Directors. Mr. Wechsler indicated that he thought some areas which are bothering the S.E.C. were trades between the Corporation and Jaffee & Company, as principal, in certain cases where Jaffee & Company had acted as an underwriter. Mr. Wechsler also believed the S.E.C. was concerned with the possibility of problems involving interpositioning.

*Id.* at 9–10. At this meeting defendant Fredricks was elected as a director of the Fund. Wechsler was also elected Secretary of the Fund after the Board accepted the resignation of Mary Ann Abella. *Id.* at 2.

Abella testified again on May 15, 1972 and he was again accompanied by Wechsler. Kass, Goodkind submitted to the Fund a statement for services rendered (again to the attention of defendant Abella) dated August 1, 1972 in the amount of $10,949.25, which included charges for "appearance before SEC with Frank Abella on May 15, 1972". Plaintiff's Exhibit 21. The minutes of a special meeting of the Board held on May 22, 1972 (Plaintiff's Exhibit 7), a week after Abella's testimony, indicated only the following:

There then followed a short review of the continuing private investigation of the S.E.C. into the affairs of the Fund. The directors were thereupon shown a copy of the Order of Investigation, with a warning not to exhibit its contents to any other party. Mr. Wechsler stated that he expected to receive a letter shortly from David M. Butowsky, counsel to Wilton Jaffee, discussing some of the problems involved as seen by Butowsky.

*Id.* at 4. A letter, dated May 24, 1972 was sent from Butowsky to the Cambridge Fund c/o Stuart Wechsler. Plaintiff's Exhibit 12. This was apparently part of the negotiations between the Fund and Jaffee with respect to settling any claims that the Fund might have had against Jaffee. The contents of the Butowsky letter is summarized in its first paragraph:

As you know, the Securities and Exchange Commission ("SEC") has been conducting an investigation involving, among other things, possible violations of sections 17(a) and 10(f) of the Investment Company Act of 1940 ("1940 Act"). This firm represents Wilton L. Jaffee who was president and a director of the Jaffee Fund, Inc. ("Fund") when the transactions under inquiry occurred. This letter discusses the applicable law and the relevant facts with a view to establishing whether and to what extent a right of action may exist on behalf of Cambridge Fund, Inc. (previously Jaffee Fund, Inc.).

Butowsky, reviewing each transaction, concluded that most of the transactions did not violate Section 10(f) "because Jaffee & Co. does not appear to have been the principal underwriter with respect to them". Butowsky further concluded that Jaffee did not violate Section 10(f) or 17(a) because "by no standard" could Jaffee be said to have acted "knowingly":

Indeed, Mr. Jaffee attempted to ascertain the legality of such transactions under the Act through counsel, and through those persons to whom he entrusted the administration of the Fund. In this regard it is entirely fitting to note that the use of common control to reduce tiers of affiliation from 3rd level to 2nd level affiliation is an extremely sophisticated concept not generally known to attorneys or even to attorneys who are familiar with the 1940 Act. Moreover, some of these transactions were conducted by persons other than Mr. Jaffee and without the knowledge and consent of Mr. Jaffee who was completely unaware that they had been consummated until they were first brought to his attention by the SEC during the taking of his testimony.

*Id.* at 8. Butowsky also focused upon the issue of damages:

Lastly, there is to be considered the question of damage to the Fund. In a number of the transactions which may be alleged to have violated the Act there were profits and in others there were losses; in yet others there were failures to sell when although we have not made the computations involved, it may be that damages would have been less had a sale been made. Although we recognize that the Fund's board of directors may well take the position that profits on one security should not be set off against losses in another security; we do believe that all activity in a particular security should be dealt with on a net basis.

*Id.* at 8–9. Wechsler testified as to this correspondence that:

I read the letter and I reviewed its contents. I read it against the Act and I think there was some checking of the facts and the statutes described.

Tr. at 256. Wechsler concluded that certain of the trades violated Section 17(a) despite Butowsky's argument to the contrary. Tr. at 272.

In July 1972 the SEC ordered the commencement of an administrative proceeding under the federal securities laws concerning the securities transactions which were the subject of the SEC investigation. Named as respondents in that proceeding were Frank Abella, University Management Corp., Wilton Jaffee, Howard Herman and Stanley DuBoff. P.T.O. ¶ 31. Abella and Management retained the firm of Spear and Hill to represent them in the SEC proceeding. P.T.O. ¶ 38.

On September 12, 1972 a special meeting of the board of directors was held. The minutes indicate that this was the first meeting of the board since May 22, 1972. *Id.* In the course of the meeting:

Mr. Abella indicated to the Board that he thought it should discuss the present status of the Securities Exchange Commission Administrative Proceeding pres-

ently pending against him and certain former officers and/or directors of the Fund. He indicated that he thought that the discussion should be conducted in his absence and he left the room.

Mr. Wechsler then distributed copies of a letter from David M. Butowsky of the law firm of Butowsky, Schwenke & Devine, counsel for Wilton L. Jaffee, dated May 24, 1972 and copies of a letter dated September 11, 1972 from Mr. Abella's attorneys in connection with the Administrative Proceeding.

The May 24, 1972 Butowsky letter is Plaintiff's Exhibit 12 discussed above. The reference to the "letter dated September 11, 1972 from Abella's attorneys," is to a letter by Spear and Hill (Defendants' Exhibit R). It first summarizes the charges made by the SEC and then sets out various facts which focused upon Abella's lack of authority and responsibility and the absence of personal gain:

Such securities transactions occurred between March, 1969 and May, 1970, a period during which you were only an employee, and neither in control of nor acting in a decision–making capacity with your then employer (and predecessor of Management), Jaffee Management Company. You did not, at the earliest, acquire the stock of Jaffee Management Company, become an officer of the Jaffee Fund and an officer and director of Jaffee Management Company, or assume a decision–making capacity with respect to Jaffee Management Company until November, 1970, six months after the last security transaction questioned by the Commission. You did not become a director of the Cambridge Fund until February 5, 1971.

You have testified [before the SEC] that you had no responsibility for effecting any of the securities transactions constituting the alleged violations referred to in (a) and (b) above; that you did not make the investment decision with respect to any of these securities transactions; and that you did not execute any of such transactions. You further testified that the only role you played with

respect to these securities transactions was, on certain occasions, to present a recommendation to certain of the other respondents (the individuals who did have responsibility and authority with respect to securities transactions) as to whether the transaction would constitute a good investment on behalf of the Jaffee Fund.

You have advised us that you did not during this period personally purchase or sell any securities purchased by the Jaffee Fund. Further, you were not an officer, director, partner, employee or shareholder of Jaffee & Co., the brokerage firm with which most of the other respondents were affiliated. You received no profits or commissions with respect to any of the securities transactions in question.

Spear and Hill concluded "based upon the foregoing" that there is no "basis for liability on your part [under Sections 10(f) and 17(a)] to the Cambridge Fund". In light of Abella's limited authority as an employee the letter further concluded that Abella was not liable on the other charges as well: failure to disclose the transactions which violated Section 10(f) and 17(a); failure to adequately maintain books and records; and failure to supervise persons so as to prevent these violations.

The minutes of the September 12 meeting indicate that after distributing these letters:

Mr. Wechsler attempted to summarize the letters distributed [see also tr. at 146–147] and to bring the directors up–to–date on the status of the Administrative Proceeding. There was a lengthy discussion amongst the directors as to whether the Corporation might have a claim against any of the persons named in the SEC Administrative Proceeding. Various questions were asked of Mr. Wechsler regarding the measure of "damages" and the cost of litigation. Mr. Wechsler suggested that there might be various methods of measuring "damages". He further pointed out that there were numerous unresolved legal and factual issues which were as yet unresolved. He suggested

that it might be impossible to obtain counsel to represent the Fund on a contingent basis in light of the questionable amount of damages and the various possible defenses. Mr. Wechsler suggested that the Board table the question of whether it should attempt to bring suit against any of those named in the SEC proceeding until the next meeting of the Board.

The minutes indicated that Wechsler then presented to the board an "opinion" letter of Carro, Spanbock & Londin, written in 1969 to the Corporation. Carro, Spanbock was counsel to the Fund in 1969 and 1970. Tr. at 243. The Carro, Spanbock letter (Plaintiff's Exhibit 60), addressed to the Jaffee Fund, is only a half of a page long and sets out in an obviously inadequate (and incorrect) manner the following which will be quoted *in toto*:

Gentlemen:

You have requested our opinion in connection with the question of whether or not The Jaffee Fund, Inc. ("the Fund") may purchase securities from Jaffee & Co. ("Jaffee") when Jaffee is an underwriter of an offering and as such, proposes to sell a portion of its commitment to the Fund at the initial public offering price.

We have examined such documents as we deem necessary to render this opinion, including the Prospectus of the Fund dated January 3, 1969 and based on the foregoing and our conferences with members of the staff of the Securities and Exchange Commission, it is our opinion that if the management of the Fund believes the transaction will result in the best price and execution of the order, the Fund may purchase the Securities from Jaffee where Jaffee is an underwriter of the issue provided that such purchase does not violate any of the investment restrictions of the Fund.

Very truly yours,

CARRO, SPANBOCK & LONDIN

Abella and Wechsler testified that Abella called Wechsler a few weeks before the September 12, 1972 meeting and told Wechsler that while cleaning out some file cabinets (or desk bought by the Fund from Jaffee & Co.–the testimony was conflicting, Compare tr. at 228 with tr. at 478) he found this letter at the bottom of a drawer (or in the bottom drawer–again the testimony is conflicting). Mr. Jaffee had previously insisted that such a letter existed. Tr. at 201. The minutes of the September 12, 1972 meeting show that at this meeting:

Mr. Wechsler pointed out that the opinion might have misled the management of the Corporation and caused the purchases alleged by the SEC to be violations of the Investment Company Act of 1940. After some discussion the Board instructed Mr. Wechsler to send a copy of the letter to the SEC immediately.

Finally, the minutes record that:

The Board discussed the possibility of approaching the SEC with regard to the possibility of terminating the Administrative Proceeding as to Mr. Abella and University Management Corporation. Mr. Wechsler was instructed to discuss this possibility with the SEC.

Wechsler testified that at the time this request was made "I think it was the consensus that Mr. Abella's involvement was peripheral enough to make and the facts well known enough to make such an attempt desirable." Tr. at 329.[2]

Wechsler then spoke with Marvin Jacob at the Regional Office of the SEC for the purpose of carrying out the instructions of the Board. Mr. Wechsler's deposition testimony indicates that Mr. Jacob declined to terminate the proceedings against Abella because he believed that Abella was in a position where he could have stopped the transaction. Tr. at 230–232. Abella, in his deposition, states that with respect to the

**2.** This hearsay statement is admitted only to the extent that it reflects upon Abella's state of mind as to the authenticity and accuracy of the Carro, Spanbock letter and thus on his duty of disclosure to the independent directors. This testimony is not admitted for the truth of the statements made therein and indeed in a deposition taken in this action by plaintiff, Mr. Londin stated that he believed the letter was not authentic.

Carro, Spanbock letter he was informed that the SEC's view was first, that the letter was not authentic; second, that it was a bad opinion and should not have been relied upon; and third, that it did not change anything with regard to their proceeding. Tr. at 480. Wechsler testified that he also had discussions with Butowsky as to the Carro, Spanbock letter:

I think I said how could they have written this opinion and Mr. Butowsky indicated to me that he had spoken to Mr. Londin and if I can recall the words correctly I believe Mr. Butowsky reported to me that Mr. Londin had said facetiously it was one of his $25 opinions.

Tr. at 239.

The annual meeting of the Board of Directors was held on October 10, 1972. The minutes of that meeting record the following:

The Chairman then stated that it would be in the best interest of the Corporation to have Mr. Wechsler attempt to negotiate a settlement with Wilton Jaffee with respect to possible claims which the Corporation may have against Mr. Jaffee resulting from alleged violations of Section 10f and 17a [10(f) and 17(a)] of the Investment Company Act of 1940, in connection with Securities and Exchange Commission Administrative Proceeding File No. 3–3817. Upon motion duly made and seconded, it was unanimously

RESOLVED, that the Secretary of the Corporation, Stuart D. Wechsler, is authorized and instructed to negotiate a settlement with Wilton Jaffee arising out of possible claims which the Corporation may have against him resulting from alleged violations of Section 10f and 17a of the Investment Company Act of 1940, in connection with Securities and Exchange Commission Administrative Proceeding File No. 3–3817, for (a) cash consideration of a minimum amount of $15,000 and (b) a waiver of any possible claims for indemnification for legal fees by Mr. Wilton Jaffe against the Corporation.

Abella stated in his deposition that he sat in on the early part of the board meeting but "what the minutes of that meeting do not reflect is that I was excused from that meeting and there was a further discussion amongst all the attorneys and the directors who were present." Tr. at 476. Abella further stated in his deposition that:

I did make a statement ... that I thought that settlement at some point would be in order for the fund.

\*   \*   \*   \*   \*   \*

What I can recall I said was that I believed that based on my review of the transactions that took place and the information that was contained in a letter of opinion that was brought to the Fund by Carro, Spanbock & Londin that I found when I moved that the Fund's then directors or officers have adequate defenses in the event we were to try and bring about litigation for the claims of losses that the Fund had incurred from the purchase of those securities.

Tr. at 477, 1078.

The testimony also indicates that at one of these two meetings, Abella, reading from either Exhibit 46 or 47 (from the evidence it appears that it was probably Exhibit 47) discussed each transaction in terms of the amounts involved, the commissions earned by Jaffee & Co., and whether the Fund realized a profit or loss on those shares it subsequently sold and what the unrealized loss or profit was on the shares not yet sold. Tr. at 29–31, 93, 107, 975–978. The net figures on the chart indicate that the Fund had a realized profit of approximately $81,-400 and a realized loss of approximately $77,300, and an unrealized loss of somewhere between $56,350 in February 1971 and $49,000 in September 1972. We note that the charts list, as to each issue, the underwriter (referred to in Exhibit 47 as "Underwriter Principal or Managing") but nowhere does it list Jaffee & Co. as such an underwriter.

Butowsky mailed a letter to the Fund, c/o Mr. Wechsler, dated October 16, 1972, (Plaintiff's Exhibit 13) which is identical to the May 24, 1972 letter except that it makes

specific reference to the Carro, Spanbock letter, and to the net profit and loss figures discussed above and set out in Exhibit 47. See also tr. at 976–978. Jaffee was ultimately released for $16,500.

On or about July 5, 1973, defendants Abella and Management executed and delivered to the SEC an "Offer of Settlement and Consent" with respect to the administrative proceeding. P.T.O. ¶ 39. By letter dated July 20, 1973 (Plaintiffs' Exhibit 36) Management and Abella wrote to Powers, Galbraith and Fredricks to advise them of the proposed settlement of the SEC proceeding against them. P.T.O. ¶ 41. Special reference was made in that letter to four pages in the attached "draft" settlement offer "which have to do with the mitigating factors surrounding my settlement". See Plaintiff's Exhibit 36. This letter was apparently discussed by the board shortly after July 20, 1973. Tr. at 115. The SEC administrative proceeding against Abella and Management was resolved pursuant to an Order and Findings dated August 1, 1973. P.T.O. ¶ 40.

In August, 1973, Abella and Management requested indemnification from the Fund for the legal fees which they had incurred in connection with their defense of the SEC proceeding. P.T.O. ¶ 42. At a directors meeting on August 20, 1973 the directors discussed an opinion letter written by Spear & Hill and dated August 17, 1973 (Plaintiff's Exhibit 38) Tr. 299–300. This letter, like the Spear and Hill letter of September 11, 1972 (Defendants' Exhibit R) which was discussed at the September 12, 1972 meeting, summarized the charges in the SEC proceeding and then sets out various "facts" given to them by Abella. Many of these "facts" were the same as those set out in the September 11, 1972 letter which dealt with Abella's lack of authority and responsibility, and with the absence of personal gain:

3. You were employed as portfolio manager of Jaffee Management from January 1969 to February 1971.

   a. You were only an employee of Jaffee Management, and neither in control by nor acting in a decision-making capacity with respect to Jaffee Management, until you became an officer of Jaffee Management in November 1970.

   b. You did not make the investment decisions with respect to the securities transactions constituting the alleged violations.

   c. You had no responsibility for effecting any of the securities transactions alleged to have violated the securities laws.

   d. You did not execute any of the securities transactions alleged to have violated the securities laws.

.    .    .    .    .

6. You did not personally profit from any of the alleged violative transactions.

7. You did not become an officer of Jaffee Management and the Fund until six months after the last securities transaction alleged by the Commission to have violated the Investment Company Act of 1940.

*See also* ¶¶ 8 and 9 dealing with the charge of failing to adequately maintain the books. The letter in addition recites the following fact which relates to the issue of whether Abella had acted "knowingly":

5. During the period between January 1969 and February 1971 you were unaware that any securities sold to the Fund were sold in violation of any securities laws or rules and regulations of the Commission.

The letter also deals, to some extent, with facts apparently intended to relate to the liability of Management (referred to in the letter as "UMC"):

2. U.M.C. . . . is the successor corporation of Jaffee Management.

10. The charges relate to a period of time when Jaffee Management was the investment adviser of the Fund, and prior to the existence of UMC in its present form and under its present ownership and control.

Another paragraph seems to focus upon the lack of harm to the Fund:

12. The securities involved in the alleged violations appear to have been purchased by the Fund at prices including a normal and appropriate markup, not at rates artificially inflated because of the role played by Jaffee & Co.

The letter concludes that:

It is our opinion that the facts, as stated, would support a finding that you and UMC acted in good faith with respect to the aforementioned securities transactions and other alleged acts, and in a manner which you and UMC reasonably believed to be in or not opposed to the best interests of the Fund, and that you and UMC were made parties to the proceeding by reason of the fact of the offices held by you and UMC in the Fund.

Spear and Hill further concluded that the board of the Fund had the statutory authority under Delaware law to indemnify Abella and Management. In this regard the letter stated, as one of the facts, that "11. Jaffee Management . . . acted as the Fund's agent in making investment decisions".

The Spear and Hill letter also contained the following paragraph:

We have been advised orally by the Commission attorney in charge of the proceeding that he would not object if the Fund were to indemnify you and UMC for the expenses incurred in the proceeding, nor in his opinion would the Staff of the Commission recommend any action under Section 17(i) to the Commission in such event.

Abella testified that this paragraph referred to a discussion he had with Mr. Phillip Gross of the SEC in Washington, D.C. on the eve of trial on the SEC charges. Abella testified that, in the presence of Mr. Bab:

Mr. Gross said, as I remember it, that if I settled the SEC action against me by consent, that neither he nor the Commission would stand in the way if I sought indemnification for either myself or University Management from the Fund; however, if I proceeded to go to trial and

were to lose, that he could not make that representation.

Tr. at 983, *see also* tr. at 490–491.

The directors also received a draft of the Offer of Settlement although it is not clear whether or not it was discussed at the August 20, 1973 meeting. Tr. at 306, 987. The final Offer of Settlement, Plaintiff's Exhibit 24, indicates the terms of the settlement (that "solely for the purpose of this proceeding and without admitting or denying the allegations set forth in the Order, respondents consent to findings by the Commission of willful aiding and abetting . . ."; and that periods of suspension would be imposed upon both Management and Abella) and lists various mitigating factors relating to Management (Section II) and Abella (Section III). The mitigating factors include all of the "facts" recited in the Spear and Hill letters of September 11, 1972 (Defendants' Exhibit R) and of August 17, 1973 (Plaintiff's Exhibit 38) and further includes the following as to Management:

A. The violations alleged in the Order allegedly occurred prior to the existence of University Management in its present form and under its present ownership and control. None of the individual respondents named in this proceeding other than Mr. Abella who were officers and/or directors of Jaffee Management have ever been officers, directors, shareholders, or employees of University Management. Mr. Abella was only an employee of Jaffee Management during the period when the violations were alleged to have occurred.

B. Prior management of Jaffee Management have asserted that they relied upon an opinion letter dated February 24, 1969 from Carro Spanbock & Londin, attorneys for the Jaffee Fund (now the Cambridge Fund), and that they were under the impression that the matters complained of in the Order did not violate the law.

C. University Management has functioned for the past two years with an unblemished record.

D. University Management has suffered substantial financial loss as a result of this matter.

The Offer of Settlement sets out the following additional mitigating factors as to Abella:

C. He did not promulgate any of the investment, executive or compliance policies in effect at Jaffee Management during the period when the allegedly violative transactions occurred.

. . . . .

G. His role with respect to the transactions in question was limited to presenting recommendations to certain of the other respondents, the officers and directors of Jaffee Management who had responsibility and authority with respect to securities transactions, as to whether the securities involved would constitute a good investment on behalf of the Jaffee Fund. In connection with his recommendations, Mr. Abella acted in good faith and adequately performed all of the duties for which he was responsible.

H. He was not affiliated or associated with Jaffee & Co., the brokerage firm through which the transactions in question were alleged to have been executed.

I. His association with Jaffee Management was his first employment in the securities industry and his first experience with federal securities laws, rules and regulations. [This relates to ¶ 5 of the August 17, 1973 letter.]

J. He has suffered substantial financial loss and personal hardship as a result of this matter.

Wechsler testified that at this meeting he also reported to the directors his discussions with Butowsky and Jacob and his disagreement with the Butowsky opinion. Tr. at 308–309.

Abella and Management sent a letter to the directors dated September 19, 1973 (Plaintiff's Exhibit 37) which made a formal request for indemnification. Tr. at 487. The letter indicated that the SEC proceeding had been settled and that both Abella and Management would be suspended for a period of time. The legal expenses were stated to have totalled $33,060.18, that Management had paid $5,000 so that $28,-060.18 remained. Abella referred the directors to the September 11, 1972 and August 17, 1973 letters of Spear and Hill and enclosed the final Offer of Settlement, and further stated that by settling they had spared the Fund as much as $25,000 which constituted the estimated legal fees for a projected three–week trial.

On September 26, 1973 the directors of the Fund, Messrs. Abella, Powers, Fredricks and Galbraith, met to discuss the indemnification request. The directors were, at this time, in possession of two additional documents: A letter prepared by Spear and Hill dated September 25, 1973 (Plaintiff's Exhibit 39) (annexed to which was the August 17, 1973 opinion letter–Plaintiff's Exhibit 38); and an opinion letter by Kass, Goodkind dated September 26, 1973 (Plaintiff's Exhibit 40).

The Spear and Hill letter, directed to the board of directors, states that the firm represented Abella and Management in the administrative proceeding and that it was writing this letter at the request of Kass, Goodkind to be submitted with the August 17 letter. The Spear and Hill letter then summarizes its conclusions in the August 17 letter referring to the oral representation allegedly made by Phil Gross. The letter concludes that "the Fund has the discretion to indemnify" Abella and Management, and indicates that all but approximately $2,600 of its bill was attributable to Management; the other $2,600 was attributable to Abella.

The Kass, Goodkind letter discusses the authority of the Board to indemnify Abella and Management in its discretion, and further states:

In determining whether the Board should exercise its discretionary power, you should carefully consider all of the facts which you know about the Proceeding. You may also consider the fact that Spear and Hill state in their letter that they believe that the facts, as stated, would support a determination that Abella and UMC acted in good faith with

respect to the relevant securities transactions . . .

The minutes of the September 26, 1973 meeting indicate that the following occurred:

The Chairman [Mr. Abella] told the Board that University Management Corporation had received a bill for $28,060.18 for legal fees from Messrs. Spear and Hill for their services in connection with SEC Administrative Proceeding No. 3–3817. He requested, on behalf of University Management Corporation, that the Board indemnify it for these legal expenses and legal expenses in the amount of $5,000 which University had already paid Spear and Hill (an aggregate of $33,060.18).

The Chairman then left the room and Mr. Fredericks assumed the chairmanship of the meeting. There was a discussion of whether University Management Corporation should be indemnified in connection with the defense of the allegations contained in SEC Administrative Proceeding . . .

The directors considered and discussed all three Spear and Hill letters, tr. at 110–111, 151, the Kass, Goodkind letter dated September 26, 1973, tr. at 112, and the Offer of Settlement, tr. at 119. In Power's opinion they "carefully reviewed" all of these documents. Galbraith also testified that he understood that the transactions and charges involved in the Jaffee consideration as set forth in Mr. Butowsky's letter (Plaintiff's Exhibit 12) were the same transactions involved with Abella except for the roles each person played in the organization. Tr. at 147. The testimony indicates that the financial aspects of the underlying transactions were discussed. Tr. at 113–114, 153–144; *see also* tr. at 307–308.

The discussions at this meeting on whether or not to vote the indemnification focused primarily, if not solely, on Abella, tr. at 40, and revolved around the following considerations: first, that the directors "concluded, on the basis of the evidence that we had" that "Abella had no knowledgeable direct participation in the challenged transactions, that he only had the authority to make recommendations, that Jaffee was the decision–maker", tr. at 105–106, 113–114, 149, 155; second, that Abella received no personal benefit from these transactions, tr. at 114, 155; and third, that too much of Abella's time had been taken up by the litigation, tr. at 159–160, 990–991. The Board passed the following resolution:

WHEREAS, it has been determined that, in connection with the allegations contained in SEC Administrative Proceeding No. 3–3817 against, among others, Frank J. Abella, Jr. ("Abella") and University Management Corporation ("UMC"), Abella and UMC acted in good faith and in a manner they reasonably believed to be in or not opposed to the best interests of the Corporation and did not perform the actions contained in such allegations in a manner which manifested willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of their position in regard to the Corporation; and

WHEREAS, they were acting as agents of the Corporation during the period referred to in such Proceeding (except that Abella was acting in his capacity as an officer of the Corporation for a portion of such period); and

WHEREAS, Abella and UMC incurred legal expenses in defending against the allegations contained in the foregoing administrative proceeding;

IT IS HEREBY RESOLVED, that the Corporation indemnify Abella and UMC in a reasonable amount for the legal expenses incurred in defending against the allegations contained in SEC Administrative Proceeding No. 3–3817; and it is further

RESOLVED, that the amount of $33,060.18 for legal expenses of UMC is deemed unreasonable and that Robert Fredericks is authorized and directed to negotiate with UMC and/or Spear and Hill to attempt to reduce the amount of such indemnification and that Mr. Fredericks is authorized to agree with UMC to indemnify it up to $25,000 without further Board approval.

Fredricks met with Bab of Spear and Hill and was able to negotiate a reduction of the bill to $24,500. Tr. at 431, 399–504, 508. The indemnification granted by the resolution of the Fund's directors on September 26, 1973 was paid by the Fund by a check dated October 24, 1973, made payable to Management in the amount of $24,500. P.T.O. ¶ 46.

## 2. The Joint Trading Claims

At various times while Mr. Abella was an officer and director of the Fund, either he or his wife purchased, sold or held securities which were being purchased, sold or held by the Fund. P.T.O. ¶ 51. The purchases of the Abella family are listed on Defendants' Exhibit BB and those of the Fund on Defendants' Exhibit CC.

First as to various gold mining securities: Mr. Abella met, as a representative of the Fund, with a Mr. Tehan in April or May of 1971 when Mr. Tehan strongly urged an investment in gold, in particular four gold mines: Buffelsfontein Gold Mining, Ltd. ["Buffelsfontein"], Valreefs Exploration & Mining Co., Ltd. ["Valreefs"], President Steyn Gold Mining Co., Ltd. ["President Steyn"], and Doornfontein Gold Mining Co., Ltd. ["Doornfontein"], [collectively the "South African gold mining securities"]. Tr. at 734–736. On May 13, 1971 the Fund purchased 5,000 shares each of Buffelsfontein and Valreefs and 10,000 shares each of President Steyn and Doornfontein. On the same date purchases of 100 shares of each of these securities, at approximately the same price paid by the Fund, were charged to the account of "Frank and/or Mary Abella". The Fund purchased 5,000 additional shares in President Steyn in 1972 and purchased 3,500 additional shares of Valreefs in 1973–74. The Abella family holdings in Buffelsfontein were sold on December 31, 1971 for a "tax loss". P.T.O. ¶ 59. The Fund sold its entire holdings in Buffelsfontein approximately three weeks later, January 24, 1972, also for a loss, although the dollar per share loss suffered by the Fund was less than that suffered by Abella. The Abella holdings in President

Steyn and Doornfontein were sold in early 1974 for a net profit of $4,028.38. The Fund sold its holdings in Doornfontein in July 1972 and in President Steyn and Valreefs in 1973 and early 1974, all for a net profit. On May 19, 1971 (six days after the purchases of the South African gold mining securities) the Fund also purchased 10,000 shares of Camflo Mines, Ltd. ["Camflo"], a Canadian gold mine. Beginning eight months later, in January 1972, and in four later purchases, the last being on June 8, 1973, 440 shares of Camflo were purchased on the account of Mary Ann Abella. These securities were sold by the Abellas in 1972 and 1973 for a net profit of $1,018.72. The Fund sold its holdings in Camflo in early 1974, also for a profit.

The charts also indicate that the following occurred: Mr. Abella purchased, on his own account, 300 shares of Systems Associates, Inc. ["Systems"] in March of 1972. Five months later the Fund began purchasing over 13,000 shares of Systems. The transactions in MPB Corp. ["MPB"] and Sierra Research Corp. ["Sierra"] were the other way: the Fund first had a position in these securities and then securities were purchased on the Abellas' accounts. Six months after the Fund began purchasing securities in MBP, 105 shares of that security were purchased by the account of "Mary Ann Abella as Custodian for [their children]". Three years after the Fund began purchasing securities in Sierra, Mr. Abella purchased 300 shares as "custodian for" his children. The Fund continued to purchase shares in both of these companies after the Abella purchases.

The directors of the Fund, with Mr. Abella present, were advised prior to the Abella family's first purchase of the South African gold mining securities that a potential conflict of interest might arise when a director purchased, held, or sold securities which were, at the same time being purchased, held, or sold by the Fund. The minutes of a special meeting of the Board of Directors on April 26, 1971 (Defendants' Exhibit T) indicates that the following discussion occurred:

Mr. Abella stated that the next order of business would be the consideration of

the preparation of a code of ethics to govern securities transactions for the personal accounts of officers, directors and employees of the Corporation. It was pointed out that a large number of potential conflicts of interest exist when officers and directors purchase or sell securities which the Corporation is either planning to acquire or liquidate or which are in its portfolio. Potential problems include the acquisition of securities by officers and directors prior or concurrently with their acquisition by the Corporation; or the sale by officers and directors prior to or concurrently with the sale by the Corporation. Often, such insiders are acting on independent information, and may have contemplated such purchases or sales prior to learning of the Corporation's intentions at Board meetings or otherwise. The possibility that small purchases, such as of 100 or 200 shares, or of $5,000 or less in market value, might be deemed to fall outside the scope of the proposed code of ethics, was also noted. *Id.* at 4.

The testimony at trial indicated that Abella had the authority to place orders for the accounts in the name of his wife. Tr. at 681, 684, 709–710. Furthermore, the purchases of these securities were paid for with checks drawn on a joint checking account in the names of Mr. and Mrs. Abella, and funds deposited in that account came primarily from Abella. P.T.O. ¶ 54. We therefore find that the transactions on the accounts where Mrs. Abella was listed either as a joint owner or individually can and should be attributed to Abella.

## B. LIABILITY

### 1. The September 26, 1973 Indemnification: Ultra Vires and Public Policy

#### a. Ultra Vires

Plaintiff contends that it may recover from all of the defendants the money paid by the Fund pursuant to the resolution of September 26, 1973 because the independent directors lacked authority to indemnify Management and Abella under Delaware law and under the Fund's charter and by-laws. Plaintiff's motion, prior to trial, for summary judgment was based, in part, on this ultra vires claim (*see*, Plaintiff's Memorandum of Law in Support of its Motion filed November 16, 1978 at 110). That motion was denied by Memorandum Decision dated January 31, 1979, [the "1979 Memorandum Decision"] wherein we held that under Section 124 of the General Corporation of Delaware, the *ultra vires* claim could not be raised, in the first instance, against defendants Management and Abella. Plaintiff asserts that under Section 124(2) [3] the ultra vires claim may be raised against defendant Fredericks and that it may recover against defendants Management and Abella on the theory that they are fiduciaries and that a fiduciary may not profit at the expense of his *cestui que trust.* Plaintiff, at trial, requested that we reconsider our ruling on the *ultra vires* claim and we have received extensive briefs and heard oral argument on these issues from all parties. Because the *ultra vires* claim may be raised, in the first instance, as to defendant Fredericks, we must reach the merits of the *ultra vires* claim. Although the question is not without difficulty, we find that the indemnification vote was not *ultra vires.*

Abella and Management's request for indemnification was made pursuant to subsections (a) and (f) of Section 145 of the General Corporation Law of Delaware (P.T.O. ¶ 42). Section 145(a) provides that a corporation may indemnify any person who was made a party to an investigation or proceeding "by reason of the fact that he is or was a director, officer, employee or agent of the corporation", while subsection (f) provides that:

---

**3.** Section 124 of the General Corporation Statute abolishes *ultra vires* in all but three situations. The only possible applicable provision is § 124(2) which permits *ultra vires* to be raised:

In a proceeding by the corporation, whether acting directly or through a receiver, trustee, or other legal representative, or through stockholders in a representative suit, against an incumbent or former officer or director of the corporation, for loss or damage due to his unauthorized act; . . .

The indemnification provided by this section shall not be deemed exclusive of any other rights to which those seeking indemnification may be entitled under any *bylaw*, agreement, *vote* of stockholders or *disinterested directors* or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or *agent* ...". [Emphasis added.]

It is conceded that indemnification was proper under either subsection (a) or (f) of the Delaware statute only if Management and Abella were made parties to the SEC proceeding, which involved allegations that Abella, Management and others caused the Fund to purchase certain portfolio securities in violation of the Investment Company Act (P.T.O. ¶ 31), by reason of the fact that at that time they were acting as "agents" of the Fund (P.T.O. ¶¶ 35 and 36).

Management is the investment adviser for the Fund. A mutual fund such as the Fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belongs to the individual investors holding shares in the fund. Mutual funds, with rare exception, are not operated by their own employees. Rather the management of this asset pool is largely in the hands of the investment adviser, an external entity which organizes the fund and provides it with investment advice, management services pursuant to an advisory contract, and office space and staff. The adviser either selects or recommends the fund's investments and rate of portfolio turnover, and operates or supervises most of the other phases of the fund's business. *See* S.Rep. No. 91–184 p. 5 (1969), U.S.Code Cong. & Admin.News 1970, p. 4897. Here Management was made a party to the SEC proceeding because it had acted under § 2 of its written advisory contract with the Fund which provided, in relevant part:

The Manager shall furnish to the Board of Directors and officers of the Investment Corporation advice and recommendations with respect to the acquisition, by purchase, exchange, subscription or otherwise, the holding and disposal, through sale, exchange or otherwise, of securities and advice and recommendations with respect to other aspects of the business and affairs of the Investment Corporation; and shall, subject to the Board of Directors of the Investment Corporation, manage and supervise the business and affairs of the Investment Corporation.

Plaintiff contends that "the relationship of an investment adviser to a fund is not [as a general matter] cognizable as agency under the Delaware statute", because although the investment adviser is a fiduciary, "the determining factor in a finding of agency, under Delaware law, is the extent of control which may be exercised by one party over the activities of another", and that "[t]he reality of the relationship between an investment adviser and the mutual fund it manages is that the fund is almost totally under the control of the adviser and not the reverse." Plaintiff's Preliminary Post–Trial Memorandum of Law at 15–23. The plaintiff argues that this is particularly true here, in that "under the [investment advisory] contract the Fund either accepts or rejects the advice of Management, but does not supervise the giving of it", and "moreover, once the Fund has accepted advice given by Management, it is within the sole discretion of Management to choose the dealer through whom the security is purchased." *Id.* at 20.

We find that defendants Management and Abella were "agents" within the meaning of the Delaware indemnification statute. Management sought indemnification for legal expenses incurred in a proceeding challenging the propriety of its actions in recommending various securities to the Fund. Because of the unusual structure of the Fund, the duty of investigating and recommending portfolio securities, which would ordinarily be entrusted to an employee or officer of the Fund, is here entrusted to the investment adviser. We think that under these circumstances the adviser may obtain indemnification from the Fund under the Delaware indemnification statute which was enacted "primarily

to permit corporate executives to be indemnified in situations where the propriety of their actions as corporate executives is brought under attack", Folk, *The Delaware General Corporation Law*, at 98. The fact that substantial discretion was vested in Management in making those recommendations does not negate agency. *See* Restatement 2d of Agency, ¶ 14, comment b. We find support for our decision in *Merritt–Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138 (Del.Super.1974) ["*Merritt–Chapman*"] where the Delaware court held that, under a contract with language similar to that found here, an agency relationship existed for purposes of the Delaware indemnification statute. In *Merritt–Chapman* the chairman of the board and the president of a wholly–owned subsidiary of Merritt–Chapman & Scott Corp. ["MCS"], whose employment contract with MCS provided that he would manage MCS's private financing and lending business activities "subject to [MCS's] control and direction" was held to be an "employee or agent" for the purpose of Delaware indemnification statute. *Id.* at 141–142.

Abella was employed by Management as the portfolio manager for its sole client, the Fund, and in that position had the responsibility of analyzing corporations to ascertain whether the purchase of their securities should be recommended to the Fund by Management, and making recommendations to Jaffee Management Company, Inc.'s officers concerning purchases of such securities by the Fund (P.T.O. ¶ 9): "A subagent performing acts which the appointing agent has authorized him to perform in accordance with an authorization from the principal is an agent of the principal ..." Restatement 2d of Agency § 5, comment d. *See also United Bonding Ins. Co. v. Baneo Suizo–Panameno, S.A.*, 422 F.2d 1142, 1146 (5th Cir. 1970).

Plaintiff contends that even if the defendants were agents and indemnification therefore permissible under Delaware law, the Fund's certificate of incorporation and by–laws precluded indemnification. The certificate of incorporation of the Fund at the time of the indemnification provided:

*SEVENTH*: The Board of Directors of the Corporation *shall* indemnify each director or officer (and his heirs, executors and administrators) *in accordance with the provisions contained in the by–laws* of the Corporation. [Emphasis added.]

Plaintiff's Exhibit 1. The by–laws of the Fund, in turn, provided in relevant part that:

*Section 5.09*

Each director and officer (and his heirs, executors and administrators) may be indemnified by the corporation against reasonable costs and expenses incurred by him in connection with any action, suit or proceeding to which he may be a party by reason of his being or having been a director or officer of the corporation, except in relation to any actions, suits or proceedings, in which he has been adjudged liable because of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office ...

Plaintiff's Exhibit 68. The charter was amended in December, 1968. Prior thereto, the charter authorized the Fund to indemnify "any person to the full extent permitted by Delaware law." Plaintiff asks us to infer from the amendment of the charter that the Board and the stockholders by their silence as to "agents" in the amended charter and by–laws sought to narrow the statutory provisions and to exclude agents of the corporation. Plaintiff further contends that under Delaware law, entering into the consent decree was the equivalent of being "adjudged liable because of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office."

Plaintiff relies upon two Delaware cases: *Essential Enterprises Corp. v. Dorsey Corp.*, 40 Del.Ch. 343, 182 A.2d 647 (1962) and *Merritt–Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138 (Del.Super.1974). *Essential Enterprises, supra*, was decided under 8 Del.C. § 122(10), the predecessor statute to Section 145. A previous stockholder's suit had charged various directors with knowing

participation in a transaction intended to serve the purely personal purposes of one of the directors. This prior suit had been settled, the settlement terms not imposing any personal liability on the individual defendants. The directors then brought this suit seeking to compel indemnification under the statute and the corporation's by-laws. The Delaware Code, at that time, gave the corporation the power to indemnify its directors except when they had been "adjudged in such action, suit or proceeding to be liable for negligence or misconduct in the performance of duty." The Delaware Code provision was not automatic–it had to be implemented by some corporate action. The corporation's by-laws authorized indemnification "provided, however, that this indemnity shall not extend to any case where such Director shall be finally adjudged in any suit or proceeding to be liable because of failure in the performance of his duties as a Director, *or to any compromise of any such liability.*" (Emphasis added.) The court held:

> I do not view the statute and by-laws as being in conflict. I say this because I believe the by-law limits the scope of the power granted the corporation by the statute. A corporation is free to invoke less than all the indemnification power granted it under this particular statute, thus the by-law governs here.

*Id.* 182 A.2d at 653. Since the directors had compromised as to charges which, if proven, constituted a failure of the directors in the performance of their duties, the express language of the by-laws barred any indemnification. Thus indemnification was not allowed.

In *Merritt–Chapman, supra,* four persons sought to compel the corporation, Merritt–Chapman & Scott Corp. ["MCS"] to indemnify them under Section 145(a) and (c) of the General Corporation Law of Delaware for expenses incurred in defending against criminal charges that they had participated in a plan to have MCS secretly purchase hundreds of thousands of shares of its own common stock. At the first trial guilty verdicts were returned against all four but the convictions were thereafter reversed on appeal. After two further retrials of two of the claimants, Wolfson and Gerbert, Gerbert was found guilty as to one of the five counts in the indictment. The charges were then settled as to all four defendants: Wolfson entered a plea of *nolo contendere* to one of the counts and all the other charges were dropped against him; Gerbert agreed not to appeal his conviction and the other charges were dropped against him; and the prosecution agreed to drop the charges as to the remaining two defendants. Wolfson and Gerbert were fined and given suspended sentences. As to the charges that were dropped, the court held that the four claimants were entitled to indemnification under Section 145(c) which made indemnification mandatory. Wolfson and Gerbert further sought indemnification under Section 145(a) and the by-laws as to the charges not dropped. The by-laws of the corporation provided that the relevant persons "shall be" indemnified "except in relation to matters as to which he shall finally be adjudged in such actions ... to have been derelict in the performance of his duty." Wolfson and Gerbert contended that they met the standard of conduct set out in the statute, that although subsection (a) of the statute was permissive, the corporate by-law made such indemnification mandatory, and they did not fall within the exception set out in that by-law. The court held that the by-law did not make indemnification under subsection (a) of the statute mandatory; that under subsection (f) of the Delaware statute however they would have had an independent right to compel indemnification under the by-law but for the fact that they fell within the exception–they had been adjudged to have been derelict in the performance of their duties: Gerbert because a judgment of conviction had been entered against him; Wolfson because "[a]lthough a plea of *nolo contendere* may not be used as an admission in another action, upon acceptance by the court and the imposition of sentence there is a judgment of conviction against the defendant." *Id.* at 143.

We find that neither case cited to us by plaintiff compels us to hold that the independent directors could not vote to indemnify Management or Abella. There are at least two material differences between our case and the cases cited to us by plaintiff. First, in *Essential Enterprises, supra*, and *Merritt–Chapman, supra*, the plaintiff corporate officer sought to have the court *compel* the corporate directors to indemnify him–thus the court had to find a *provision* in the statute or in the corporation's charter or by–laws that would *mandate* indemnification under the circumstances presented to the court. Here the directors have already voted the indemnification. As a result indemnification would be proper even if all we find is that the directors acted under some discretionary authority to indemnify. We think this discretionary authority may be found either in a vote of independent directors referred to in Section 145(f) of the Delaware indemnification statute, or in a by–law of the corporation if there is no conflicting charter provision. Second, in *Essential Enterprises, supra* and *Merritt · Chapman, supra*, the courts held that they could not compel indemnification, not because the relevant language in the by–laws was silent on the issue as it is here, but because it was expressly forbidden by the language in the by–law. Plaintiff asks us to read in this express preclusion of indemnification in the charter from the fact of its amendment–however we do not think the amendment justifies such as inference. We think an equal, if not more reasonable, inference is that the amendment was intended to have the charter deal only with the *mandatory* indemnification of officers and directors, (thus the use of the word "shall") leaving other forms of indemnification to be governed by the Delaware statute and by the actions of the Board pursuant thereto. Whether the vote of the board of directors on September 26, 1973 constituted an implicit passage of a by–law permitting the discretionary indemnification involved here (as the board was authorized to do under Section 5.10 of the by–laws) or whether it was the type of vote contemplated by Subsection (f) of the Delaware stat-ute, we find that as a result, the indemnification was not *ultra vires*.

Nor do we think the reasoning of *Merritt–Chapman, supra*, would preclude indemnification under by–law 5.09 where the indemnitees have entered into a consent decree even if this by–law would be applicable to Management and Abella. While a plea of *nolo contendere* may result at some point in the entry of a judgment of conviction against the party entering the plea, a consent decree does not result in an adjudication against the party consenting to it. *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976), relied upon by plaintiff because it "equated" a consent judgment with a plea of *nolo contendere*, is not only not contrary to our decision, it supports our conclusions. In *Lipsky* the plaintiff had attached to his complaint a copy of an SEC civil complaint filed against the defendant [CUC] in federal court alleging various violations of the securities laws. The prior SEC action had ultimately resulted in a consent judgment. Defendant moved to strike from the pleadings all references to the SEC complaint as immaterial, and the Court of Appeals affirmed the district court's granting of that motion:

> Fed.Rules Evid.Rule 410, 28 U.S.C., prohibits a plea of *nolo contendere* from being later used against the party who so pleaded. Although CUC did not, technically, plead *nolo contendere* to the SEC's complaint, *nolo* pleas have been equated with "consent decrees" for purposes of the proviso to § 5(a) of the Clayton Act,[8] [8. 15 U.S.C.A. § 16(a). In essence, this section gives collateral estoppel benefits ... where final judgments and decrees have been rendered in antitrust suits commenced by the Federal Government. A proviso, however, excludes consent judgments ...]. The reason for this equivalence is that both consent decrees and pleas of *nolo contendere* are not true adjudications of the underlying issues; a prior judgment can only be introduced in a later trial for collateral estoppel purposes if the issues sought to be precluded were actually adjudicated in the prior

trial. The consent decree entered into by the SEC and CUC was the result of private bargaining, and there was no hearings or rulings or any form of decision on the merits by the district court.

*Id.* at 893–894.

### b. *Public Policy*

Plaintiff contends in the briefs submitted during trial that "indemnification has been denied as a matter of federal policy in actions in this Circuit brought under the federal securities laws. *Cf. Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1288–89 (2d Cir. 1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath,* 378 F.Supp. 112, 135–36 (S.D.N.Y.1974)", Plaintiff's Preliminary Post–Trial Memorandum of Law at 24 and that, "at a minimum", under Section 17(h) and the SEC guideline promulgated pursuant thereto, "inasmuch as Management and Abella consented to findings that they willfully aided

and abetted violations of the Investment Company Act of 1940, indemnification was improper absent a finding by independent legal counsel that they were not guilty of misconduct." *Id.* at 27. *Globus, supra,* and *Herzfeld, supra,* referred to in plaintiff's brief, stand for the proposition that "one who intentionally joins in the perpetration of a fraud is denied a right of indemnity from others participating in the wrong" *Herzfeld, supra* at 135. Read *most liberally,* these decisions stand for the proposition that it is against public policy to allow a party who has been adjudicated to have been engaged in reckless, willful or criminal conduct to shift his liability to others, *Herzfeld, id., Globus, supra* at 1288–89.

We find two problems with plaintiff's argument. We think plaintiff is, in fact, arguing no more than that the indemnification violated Sections 17(h) and (i) of the Investment Company Act of 1940 and the SEC Guideline promulgated pursuant thereto,[4] without having to focus upon the more

---

**4.** Sections 17(h) and (i) of the Investment Company Act provide in relevant part:

(h) After one year from the effective date of this subchapter, neither the charter, certificate of incorporation, articles of association, indenture of trust, nor the by–laws of any registered investment company, nor any other instrument pursuant to which such a company is organized or administered, shall contain any provision which protects or purports to protect any director or officer of such company against any liability to the company or to its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office.

.    .    .    .    .

(i) After one year from the effective date of this subchapter no contract or agreement under which any person undertakes to act as investment adviser of, or principal underwriter for, a registered investment company shall contain any provision which protects or purports to protect such person against any liability to such company or its security holders to which he would otherwise be subject by reason of willful misfeasance, bad faith, or gross negligence, in the performance of his duties, or by reason of his reckless disregard of his obligations and duties under such contract or agreement.

The SEC Guideline relied upon by plaintiff is the SEC Guidelines for Preparing Form N–8b–1 [the Registration Statement to be filed by an investment company], CCH Fed.Sec.L.Rptr. ¶ 15,301 at p. 39, 292, which provides in part:

*Item 19*

Indemnification is permissible under Section 17(h) if a case goes to judgment on the merits and the court makes an express adjudication absolving the person concerned of liability. However, under the laws of some states, indemnification is permitted even though there is no determination of nonliability on the merits (e.g. where the case is dismissed because of a procedural point, or where there is a settlement). It is the staff's position that in order to comply with Section 17(h), any indemnification provision must provide that if there is neither a court determination on the merits that the defendant is not liable nor a court determination that the defendant was not guilty of willful misfeasance, bad faith, gross negligence, or reckless disregard of the duties involved in the conduct of his office, no indemnification will be permitted unless an independent legal counsel (not including a counsel who does work for either the investment company, its adviser or principal underwriter, or persons affiliated with these persons) determines, based on a review of the facts, that the person in question was not guilty of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his office.

On the motion for summary judgment we held that:

difficult question of whether or not plaintiff has an implied private cause of action under those sections—an issue we decline to resolve here because of our disposition of this claim under Section 36 of the Act. Our second problem with plaintiff's argument is that to the extent there exists an independent public policy theory of recovery based on *Globus* and *Herzfeld*, this case is distinguishable in that here, unlike the situation in either of these two cases, there has been no adjudication of willfullness—only the entry of a consent order with such findings.

### 2. § 36 Claims: Breach of Fiduciary Duty

#### a. The Existence and Scope of the Fiduciary Duty

The Section 36 claims are based upon a series of cases under Section 36(a) dealing with the fiduciary duties of the investment adviser and the directors, affiliated and unaffiliated, of the Fund with respect to the recapture of brokerage fees. *Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977), *cert. denied*, 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977); *Fogel v. Chestnutt*, 533 F.2d 731, 745 (2d Cir. 1975), *cert. denied*, 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976); *Moses v. Burgin*, 445 F.2d 369 (1st Cir. 1971), *cert. denied*, 404 U.S. 944, 92 S.Ct. 532, 30 L.Ed.2d 547 (1972). Section 36(a) provides, in relevant part:

> The Commission is authorized to bring an action . . . alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts—
>
> > (1) as officer, director, member of any advisory board, investment adviser, or depositor; . . .

In each of these cases the plaintiff[s], shareholder[s] of a mutual fund, brought a derivative suit on behalf of the mutual fund against the investment adviser and the affiliated directors claiming that the fund should have recaptured a portion of the brokerage commission paid to brokers who purchased and sold the fund's portfolio securities. These portions of the commissions, called "give-backs", represented the excessive portion of the commission paid to brokers on the large fund transactions because of exchange rules requiring fixed rates with no quantity discounts, which the brokers, for competitive reasons, were willing to give up as instructed by the fund (because of anti-rebate rules these sums could not be paid back directly to the fund). The practice had been to pay these sums, as a reward, over to the brokers who sold the fund's own shares, or to brokers who provided investment advice to the adviser. The plaintiff, in each of these cases, contended that under existing rules on at least some of the exchanges, these sums could have been paid over to the investment adviser or to an affiliate of the adviser, and that the investment advisory fee that the fund paid to the adviser would be reduced accordingly. Thus the fund could indirectly "recapture" the sum.

In *Moses v. Burgin* the issue arose under Section 36 prior to its amendment in 1970. The First Circuit panel, *per* Judge Aldrich, held that it would proceed under a settled line of authority that the Act impliedly authorized the courts to grant civil recovery if a fiduciary's duty fell within the scope of the phrase "gross misconduct or gross abuse of trust" contained in Section 36 of the Act. The court held that under the fund's charter the directors of the fund had to recover the sums where, as here, that option was available, and that the investment adviser and the affiliated directors had a fiduciary duty to disclose this option to the independent directors. The ICA was held to impose on an investment adviser and affiliat-

This guideline, although stating what must be included in the registration statement, does not require the court to rule that an indemnification is *per se* void and recoverable from

the parties particularly where other evidence indicates that the Board of Directors had appropriately considered all relevant matters. 1979 Memorandum Decision at 7.

ed directors "a duty of full disclosure of information" to the unaffiliated directors, in every area where there was even a possible conflict of interest between their interest and the interests of the fund." *Id.* at 376, *citing to Imperial Financial Services, Inc.,* CCH Fed.Sec.L.Rep. ¶ 77,287 at 82,464 (SEC 1965) (investment adviser and affiliated directors have the obligation "to insure that unaffiliated directors are furnished with sufficient information so as to enable them to participate effectively in the management of the investment company"). The court further held:

> Except where it may be fairly assumed that every unaffiliated director will have such knowledge, effective communication is called for. And, in testing that assumption, it must be borne in mind that they are not full time employees of the fund and it may be—as with Fund's unaffiliated directors—that neither their activities nor their experience are primarily connected with the special and often technical problems of fund operation. If management does not keep these directors informed they will not be in a position to exercise the independent judgment that Congress clearly intended. The only question can be whether the matter is one that could be thought to be of possible significance.

*Id.* at 377. Plaintiff had asserted that there was possible conflict of interest here inasmuch as failure to recapture would permit a continuation of the policy of using the funds to reward those brokers who sold the fund's shares, and the adviser's fee was computed on the basis of the volume of those sales. Thus a duty to disclose arose. The court found that as a result of meetings with SEC representatives the "Management defendants" were in possession of information as to the possibility of recapture, that they intentionally failed to disclose this information to the unaffiliated directors, knowing that recapture was a serious and unresolved issue in the industry and knowing that it was an issue that involved a potential conflict of interest. The court held that these "Management defendants" "were guilty of gross misconduct

within the meaning of the Act in failing to disclose the possibility of ... recapture to the unaffiliated directors" and "must be held liable for damages under Section 36." *Id.* at 384. The court held that the unaffiliated directors on the other hand would not be held liable because plaintiff failed to show that they knew, or reasonably should have known of the possibility of recapture (they did not have any personal conflicting interest which should have sharpened their attention) and failed to show that the unaffiliated directors violated any duty to discover and explore the issue on their own: recapture was a new problem and the unaffiliated directors were entitled to rely on the investment adviser and the affiliated directors, who devoted full time to the investment industry, to advise them of the emergence of this issue. *Id.*

*Fogel v. Chestnutt, supra,* arose under § 36 as amended: The amendment had substituted for the language "gross misconduct or gross abuse of trust" the words "breach of fiduciary duty involving personal misconduct" and that portion of the statute became subsection (a). The Second Circuit adopted the First Circuit's enunciation of the duty of the investment adviser and affiliated directors to disclose under § 36. The court found that here there had not been effective communication of the problem to the independent directors. The SEC had issued a publication (P.P.I.) and a proposed Rule dealing with the possibility of recapture. An affiliated director and part owner of the adviser improperly (and without any real basis) advised all of the directors of the fund and the adviser that the SEC recommendations as to recapture did not apply to it and the matter was therefore not discussed. The court held:

> Reliance on such obviously casual advice from a lawyer having a personal stake adverse to the shareholders affords no protection unless it is right—in which event it is unnecessary to assert the defense of reliance.

*Id.* at 749. The court concluded:

> PPI had raised a question which, in the language of *Moses,* 445 F.2d at 377,

"could be thought to be of possible significance" and on which the interests of the Fund and the Adviser were in clear conflict. Congress had mandated independent directors in order "to supply an independent check on management and to provide a means for the representation of shareholder interests in investment company affairs." S.Rep. No. 91–184, 91st Cong. 1st Sess. (1969), reprinted in 3 U.S. Code Cong. & Admin.News, 91st Cong. 2d Sess. at p. 4927 (1970). The minimum requirement to enable the Fund's independent directors to discharge these duties with respect to recapture was a careful investigation of the possibilities performed with an eye eager to discern them rather than shut against them, and, if these possibilities were found to be real, a weighing of their legal difficulties and their economic pros and cons. It would have been still better to have the investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors.

If this had been done and the independent directors had concluded that, because of legal doubts, business considerations or both, the Fund should make no effort at recapture, we would have a different case. But when there has been inadequate communication to the independent directors, it is no defense to the Adviser and those exercising control over it that a decision not to recapture, taken after proper communication, would have been a "reasonable business judgment."

*Id.* at 749–750. The court concluded that the investment adviser and affiliated directors were liable, but that:

> Under the principle laid down in *Moses, supra*, 445 F.2d at 384, we would see no basis for imposing liability on directors who were not interested.

*Id.* at 750.

In *Tannenbaum v. Zeller, supra* the Second Circuit again dealt with the problem of recapture. Discussing the basis for the federal fiduciary duty the court wrote:

Section 36 of the Investment Company Act of 1940, which prohibited "gross misconduct or gross abuse of trust" as originally enacted, 54 Stat. 841, and "breach of fiduciary duty involving personal misconduct" as amended in 1970, 15 U.S.C. § 80a–35, established a federal standard of fiduciary duty in dealings between a mutual fund and its adviser. *Fogel v. Chestnutt, supra*, at 745, *citing Brown v. Bullock*, 294 F.2d 415, 421 (2d Cir. 1961), and *Rosenfeld v. Black*, 445 F.2d 1337, 1345 (2d Cir. 1971), *petition for cert. dismissed*, 409 U.S. 802, 93 S.Ct. 24, 34 L.Ed.2d 62 (1972). In its original form, this section authorized SEC injunctive actions and, by implication, private damage actions by investors against fiduciaries who failed to meet its standards. The remedial 1970 amendment of the section added a subsection (b) which explicitly granted a private right of action to recover unreasonable compensation paid by a fund to its investment adviser. Congress did not intend this modification to abrogate the private action already recognized under the Act for other types of breach of fiduciary duty. *See Fogel v. Chestnutt, supra; Moses v. Burgin, supra*, at 373, 373 n.7, 384; S.Rep. No. 184, 91st Cong., 1st Sess. 16 (1969), U.S.Code Cong. & Admin.News 1970, p. 4897; H.R.Rep. No. 1382, 91st Cong., 2d Sess. 38 (1970). But *see Monheit v. Carter*, 376 F.Supp. 334, 342 (S.D.N.Y.1974). Consequently, appellant's claim of breach of duty under the Act is properly before the court.

*Id.* at 416. The court then set out the following test which "encompasses both the *Moses* test of the adequacy of the disclosure of the possibilities of recapture by the adviser to the independent directors, and the *Fogel* test of the 'minimum requirement' for the discharge of the independent directors' duties after such disclosure has been made." *Id.* at 419, n.2:

> Thus the decision to forego recapture here did not violate the fiduciary obligations of either the Fund's adviser or directors under Section 36 of the Investment Company Act if the independent directors (1) were not dominated or un-

duly influenced by the investment adviser; (2) were fully informed by the adviser and interested directors of the possibility of recapture and the alternative uses of brokerage; and (3) fully aware of this information, reached a reasonable business decision to forego recapture after a thorough review of all relevant factors. *Id.* at 418. As to the first element the court found that the independent directors were not dominated or unduly influenced by the investment adviser: the parties had stipulated that the directors were independent and at trial there was no real challenge to the factual independence of these directors; it was shown by the record that while the independent directors received information on the possibility of recapture and recommendations against it from the adviser, all this material was presented "in a neutral, even–handed fashion"; and the evidence demonstrated that the independent directors, "a well–qualified board" separately considered the subject and arrived at their own conclusion (and did not merely rubber–stamp the recommendations of the adviser) that recapture should not be undertaken. As to the second element the trial judge found that there was no evidence of non-disclosure by the adviser to the unaffiliated directors. Disclosures were "full" and "effective". As to the third element the court, after surveying the business reasons for the board's decision found that the independent directors had reached a reasonable business judgment to forego recapture after being informed of all relevant factors and thoroughly reviewing them:

It should be borne in mind that the question here is not whether, as a matter of hindsight, the determination of the independent directors was correct. The question is whether the decisions by these directors to forego recapture were rea-

sonable considered at the time and under the circumstances in which they were reached.

*Id.* at 428. The court further stated:

The independent directors also sought the advice of counsel on the recapture question. It is true that such advice was not given by wholly disinterested counsel since Sullivan & Cromwell represented [the adviser] as well as the Fund itself. Thus, "it would have been ... better to have the investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors." *Fogel v. Chestnutt, supra,* at 750. Here, however, counsel correctly advised the independent directors as to the applicable law and the necessity for reaching a reasonable business judgment on the recapture question. The fact that counsel were not disinterested does not vitiate the reasonableness of the judgment which the independent directors reached here. *See Fogel v. Chestnutt, supra,* at 749–50.

■ We hold that defendants Management and Abella had a similar duty of disclosure with respect to the Fund's payment of their legal expenses. Potential conflicts of interest arise where an adviser, or an affiliated director, seeks indemnification from the Fund or otherwise submits bills to the Fund for expenses incurred in an SEC proceeding focusing upon that party's conduct as an agent for the Fund where that conduct allegedly violated federal statutes designed to protect the Fund. Thus we hold that the fiduciary duties set out in the *Moses–Fogel–Tannenbaum* line of cases must be extended to the case before us and plaintiff has stated a cause of action under Section 36(a) of the Act.[5]

---

5.  Section 36(b), added by the 1970 amendments provides in relevant part:

(b) For the purposes of this subsection, the investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof,

to such investment adviser or any affiliated person of such investment adviser. An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment adviser, or any affiliated person of such investment adviser, for breach of fiduciary duty in respect of such compensation or pay-

Restating the criteria set out in *Tannenbaum v. Zeller, supra,* in terms of the indemnification claim here, defendants will not be found to have violated their fiduciary duties imposed by the *Moses–Fogel–Tannenbaum* line of cases if we find that the independent directors (1) were not dominated or unduly influenced by Management; (2) were fully informed by Management or Abella of all material facts which were known or reasonably should have been known to Abella and Management and which were relevant to the inquiry; and (3) fully aware of this information, reached a reasonable business decision to recapture after a thorough review of all relevant factors. Rephrased to reflect the appropriate burden of proof, in order to succeed on its claim under Section 36(a) the plaintiff must prove the following by a preponderance of the evidence: as to defendants Management and Abella, plaintiff must prove as to each defendant, that the defendant knowingly failed to fully, effectively and neutrally inform the independent directors of all material facts which were known or which reasonably should have been known to the defendant and which were relevant to the indemnification; as to defendant Fredricks, plaintiff must prove either that Fredricks, being on notice as to a particular issue knowingly breached his duty to "explore that issue on his own" *Moses, supra,* or that after conducting an independent and thorough review of all relevant factors as to that issue Fredricks failed to exercise reasonable business judgment. *Tannenbaum v. Zeller, supra,* at 418.

We further hold that defendant Abella had, under Section 36(a) of the Act, a duty to disclose to the independent directors any trading he did in securities being traded in simultaneously by the investment company. We reach this conclusion on the basis of Judge Herlands' discussion of the legislative history of the Act in his analysis in *Brown v. Bullock,* 194 F.Supp. 207 (S.D.N.Y.1961). Judge Herlands wrote:

> ... in order to prevent a conflict of interest which might arise by a director's trading in the portfolio securities simultaneously with the investment company— Section 30(e) of the bill required the director to disclose such trading to the board of directors.

. . . . .

> Acting upon the industry's assurance that the requirement for "independent directors" would impose an effective duty of vigilance on such directors and further relying upon the inherent interrelationship between the "independent directors" provisions and [Section 36 of the Act], Congress eliminated from the bill [Section 30(e)].

*Id.* at 238 n.1.

Our holding that the fiduciary duties articulated in the *Moses--Fogel–Tannenbaum* line of cases extend beyond the issue of recapture of brokerage fee and are applicable to the claims presented here is supported by the language of the recent Supreme Court opinion in *Burks v. Lasker,* 441 U.S. 471, 99 S.Ct. 1831, 60 L.Ed.2d 404 (1979). The question presented in that case was "whether the disinterested directors of an investment company may terminate a stockholders' derivative suit brought against other directors under the Investment Company Act [ICA] and Investment Advisers Act [IAA] of 1940". *Id.* at 473, 99 S.Ct. at 1834. The Second Circuit had held below that "as a consequence of the ICA 'disinterested directors of an investment company do not have the power to foreclose the continuation of nonfrivolous litigation brought by shareholders against majority

---

ments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

However subparagraph (4) of 36(b) provides:
(4) This subsection shall not apply to compensation or payments made in connection with transactions subject to section 80a–17 of this title, or rules, regulation, or orders thereunder.

Section 80a–17 governs indemnification payments. However by adding subsection (b) Congress did not intend to abrogate the private action already recognized under the Act for other types of breach of fiduciary duty. *Tannenbaum v. Zeller, supra,* at 416. We think the action here was "already recognized under the Act" by virtue of the *Moses Fogel Tannenbaum* line of cases.

directors for breach of their fiduciary duties.'" *Id.* at 475, 99 S.Ct. at 1835. The Supreme Court held:

> the threshold inquiry for a federal court in this case should have been to determine whether state law permitted [the fund's] disinterested directors to terminate respondents' suit. If so, the next inquiry should have been whether such a state rule was consistent with the policy of the ICA and IAA. Neither the District Court nor the Court of Appeals decided the first question, apparently because neither considered state law particularly significant in determining the authority of the independent directors to terminate the action. And in that circumstance, neither court addressed the question of inconsistency between state and federal law.

*Id.* at 480, 99 S.Ct. at 1838. The Court remanded the case, but first reviewed the Second Circuit's decision, because its decision was a "related determination" to the second question. The Court held that the "flat" and "absolute" rule enunciated by the Second Circuit was incorrect. The Court started from the proposition that, because of the structure of the mutual fund industry "[t]he relationship between investment advisers and mutual funds is fraught with potential conflicts of interest." *Id.* at 481, 99 S.Ct. at 1839, *quoting from Galfand v. Chestnutt Corp.*, 545 F.2d 807, 808 (2d Cir. 1976). The Court, in language reminiscent of that of Judge Herlands in *Brown v. Bullock, supra*, then wrote:

> The cornerstone of the ICA's effort to control conflicts of interest within mutual funds is the requirement that at least 40% of a fund's board be composed of independent outside directors. 15 U.S.C. § 80a–10(a).
>
> .     .     .     .     .
>
> Congress' purpose in structuring the Act as it did is clear. It "was designed to place the unaffiliated directors in the role of 'independent watchdogs' *Tannenbaum v. Zeller*, 552 F.2d at 406, who would "furnish an independent check upon the management" of investment companies,

Hearings on H.R. 10065 before a Subcommittee of the House Committee on Interstate and Foreign Commerce, 76th Cong., 3d Sess., 109 (1940). This "watchdog" control was chosen in preference to the more direct controls on behavior exemplified by the options not adopted.

*Id.* at 482, 484, 99 S.Ct. at 1839, 1840. The Court went on to hold that because "[t]here may well be situations in which the independent directors could reasonably believe that the best interests of the shareholders call for a decision not to sue—as, for example, where the costs of litigation to the corporation outweigh any potential recovery", that "[i]n such cases, it would certainly be consistent with the Act to allow the independent directors to terminate a suit, even though not frivolous." *Id.* at 485, 99 S.Ct. at 1841. Our holding here is similarly based upon the recognition that the independent directors were intended to be "independent watchdogs" and that therefore *full effective* and *neutral* disclosure *must* be made to them as to all issues relating to the management of the fund or its assets and as to which there are potential conflicts of interest.

Before determining whether or not defendants have any liability under Section 36(a) we must first deal with the preliminary statute of limitations issue.

### b.  Statute of Limitations

■ Defendants claim that this action is barred by the statute of limitations. Section 36(a) provides that the SEC may bring an action alleging that the respondent "has engaged within five years of the commencement of the action . . . in any act or practice constituting a breach of fiduciary duty . . ." Defendants contend that where, as here, we are dealing with a private cause of action, the statute of limitations of one year found in subsection (b) governs. Assuming, *arguendo*, a one year statute of limitations, plaintiff's action is timely.

The indemnification was voted on September 26, 1973. A derivative suit filed by Tweedy Browne & Knapp on behalf of the Fund against the defendants herein and

others was begun in New Jersey within one year of the payment of the fees. The amended complaint in that action (Defendants' Exhibit C) contains the same charges found herein—See Count XX, ¶¶ 145–154 of the Amended Complaint as well as numerous other charges. The suit was settled without prejudice pursuant to a court order which was agreed to by the defendants that an investigation would be conducted and the claims could be reasserted if warranted under the circumstances. A judgment of dismissal without prejudice was entered on May 22, 1974. A preliminary report on the investigation (Defendants' Exhibit A) was issued in October of 1974 and a final report issued in April, 1975. This action was filed in July of 1975. (See Tr. 596–601; 1203 1205.)

We find that the statute of limitations was tolled by the initial filing of the derivative suit in New Jersey. *See Marco v. Bank of New York*, 272 F.Supp. 636, 657–58 (S.D. N.Y.1967), *aff'd*, 398 F.2d 628 (2nd Cir. 1968). When the statute began running again depends upon when the New Jersey action was terminated. The judgment of dismissal in the New Jersey action, as indicated above, was made contingent upon the Fund's conduct of an investigation and, we find, contingent upon its conclusion within "a reasonable time". The final report on the investigation of *all* the charges asserted in that complaint was issued less than a year after the court order—certainly within a reasonable time. We find that the New Jersey action effectively terminated in April, 1975, and that the statute began running again after that time. In light of this we find that, even if the one year statute of limitations was applicable, this action was timely.

### c. *Liability*

■ We find that defendants Management and Abella breached their fiduciary duty with respect to the September 26, 1973 indemnification. The information was presented by Management and Abella in such a one–sided and incomplete manner that it discouraged any meaningful, independent evaluation of the indemnification request by the unaffiliated directors.

First, the information was presented in such a manner that the unaffiliated directors, in considering the indemnification request, did not consider Management's conduct in 1969- 1970 or the conduct of its personnel at that time, but rather considered only the conduct of Mr. Abella, a person with whom at least two of the independent directors had worked previously at Union Carbide, tr. at 19, 72, and a person they held in the highest esteem. Tr. at 52. While some of the documents submitted to the unaffiliated directors distinguished between Abella and Management and to some extent sought to set out the relationship of University Management and Jaffee Management, *see*, the Spear and Hill letter of August 17, 1973 (Plaintiff's Exhibit 38) at ¶¶ 2 and 10; the Offer of Settlement (Plaintiff's Exhibit 24) at ¶ A, they did not do so in a comprehensive and meaningful manner. The testimony clearly indicated that the unaffiliated directors never understood this *distinction, considering* Management only to the extent they considered Abella, *see* tr. at 34, 37 38, 40, 41–42, 45–46, 93–100, 401, and that Wechsler, who was of the opinion that such a distinction did not have to be made, never informed them of it. Tr. at 195 196, 300.

Second, the substance of the SEC charges were presented to the unaffiliated directors in such a manner that they could not but conclude that there was no merit to the SEC charges except to the extent that a party such as Jaffee was willing to admit liability. Tr. at 92 93. The unaffiliated directors were given a copy of the Butowsky letter (Plaintiff's Exhibits 12 and possibly 13) which concluded first, that as to most of the transactions Jaffee & Co. was not a principal underwriter, thus precluding the finding of a violation under the relevant federal statutes; second, that at least Mr. Jaffee had relied upon the letter of counsel, Carro Spanbock, thus leaving a second essential element  that of knowing violation— unsatisfied; and third, that the Fund had suffered no damages and that therefore a third essential element did not exist. Abel-

la's oral presentation, using the charts (Plaintiff's Exhibits 46 and/or 47) reinforced some of these conclusions: The chart listed "underwriters" but at no point referred to Jaffee & Co.; the chart also netted the profit and loss figures on the sale of securities investigated by the SEC. We find that defendant Abella was aware of, yet knowingly failed to disclose, the fact that Jaffee & Co. had been listed as an underwriter on the final prospectuses of at least four of the securities being investigated by the SEC. This disclosure might have led the unaffiliated directors to investigate whether or not Jaffee & Co. was an underwriter on the other issues as well, and to further investigate whether or not as to any or all of these issues, Jaffee & Co. was, in fact, a *principal* underwriter. Abella testified that he made such a disclosure, tr. at 971. However we found his testimony not credible, *compare* tr. at 965, lines 21 through 23, 966, lines 4 through 6, and 970, lines 7 through 12, *with* tr. at 1027, line 23 through tr. at 1029 line 19, tr. at 1049 and at 1054, and inconsistent with the testimony of the independent directors. Tr. at 162–164. Defendants further were aware of, but knowingly failed to disclose, the fact that the SEC had expressed to Mr. Wechsler doubts about the viability of the "reliance–on–the–letter–of–counsel" defense in light of the SEC's serious reservations as to the authenticity of that letter. Tr. at 88–89. Disclosure of this fact might have led the directors to investigate the entire background of the Carro, Spanbock letter which would have been relevant to the viability of Management's (and possibly Abella's) alleged defense and to the entire question of "good faith". Finally, the defendants knowingly failed to disclose to the unaffiliated directors that in determining whether a statutory violation occurred damages were computed on a basis other than aggregating net realized profits and losses. *See* tr. at 53.

Similarly, the facts as to Abella's role were presented in such a one–sided and incomplete manner as to preclude any meaningful discussion by the unaffiliated directors of his conduct. The impression given from the "facts" listed in both Spear and Hill opinion letters (Defendants' Exhibit R; Plaintiff's Exhibit 38) and from the list of "mitigating" factors listed in the Offer of Settlement is that Abella could have no liability at all for the relevant transactions. Defendants failed to inform the unaffiliated directors as to whether or not Abella knew if Jaffee & Co. was a principal underwriter of the relevant issues, tr. at 162–164, and knowingly failed to disclose that the SEC informed Wechsler that it would not heed his request to have the proceedings against Management and Abella terminated because it believed that Abella was in a position to stop the allegedly illegal trades. The testimony of the independent directors was that Wechsler simply reported back that the SEC was not amenable to the suggestion. Tr. at 121, 161.

We find this case very similar to *Papilsky v. Berndt*, CCH Fed.Sec.L.Rep. [Transfer Binder 1976–1977] ¶ 95,627 (S.D.N.Y.1976) a case involving recapture of brokerage fees, and decided after the Second Circuit decision in *Fogel, supra*. *Papilsky*, a stockholder's derivative suit, was tried to the court without a jury. The defendants, at the time of trial, were the mutual fund, its affiliated directors, and its investment adviser. As indicated in *Fogel, supra*, the recapture issue had been the subject of various SEC public releases. The court found that, as these releases were issued, they were brought to the attention of the unaffiliated directors (who like the unaffiliated directors here were not sophisticated in the investment company field) by the defendants. The court also found, however, that on each occasion the fund's counsel, also counsel to the adviser, repeatedly expressed its opinion in a conclusory and "casual" manner, that recapture would be illegal. The advisor, at these meetings, also urged various business reasons why recapture was inadvisable. The court found that as a result, any further meaningful inquiry into the matter by the board was discouraged. The court analyzed plaintiff's claim in terms of the duty to disclose as set out in *Fogel, supra*. It defined that duty in the following manner:

This duty of full disclosure with respect to the various possibilities of recapture required at a minimum "a careful investigation of the possibilities performed with an eye eager to discern them rather than shut against them and, if these possibilities were found to be real, a weighing of the legal difficulties and their economic pros and cons." *Fogel, supra* at 1344. Better still would have been the "investigation of recapture methods and their legal consequences performed by disinterested counsel furnished to the independent directors."

*Id.* at 90, 132–90, 133. Defendants contended that they had:

> . . . a defense of reliance on advice of counsel coupled with a defense that the independent directors were kept fully informed. Defendants argue strenuously that even if certain methods of recapture were in fact legal, counsel could have entertained legitimate doubts of their legality, and defendants could justly have relied on these doubts.

*Id.* at 90, 132. The court held the duty breached and rejected the defendants' defenses. The court's holding in *Papilsky* is equally applicable here:

> . . . the picture that emerges is one of [the adviser] funneling to the Board the business reasons why one or another method of recapture would be a poor idea. . . . This was not a fulfillment of defendants' duty.

> The adamant legal advice from [counsel] does not change this picture; indeed, in one sense it compounds it. Invariably, [counsel] would discuss significant information with [the adviser] before a Board presentation. At the subsequent Board meeting, [counsel] served as a reinforcement to [the adviser]: often, while [the adviser] was listing adverse business consequences of recapture, [counsel] would present a concurring legal opinion. In effect [the adviser] and [counsel] presented a unified and weighty body of opinion opposing all suggestions of recapture, or even of independent study.

*Id.* at 90, 133. We therefore find defendants Management and Abella liable for $24,500 less the $11,037 plaintiff has received in settlement with two of the former directors who allegedly wrongfully indemnified Abella. Tr. 747–748.

We hold, however, that defendant Fredricks did not, under the standards set out in *Moses v. Burgin, supra*, breach his fiduciary duty. Fredricks' deposition testimony indicates that he had little familiarity with the underlying SEC investigation and proceeding, that as to this he relied almost exclusively upon counsel for the Fund, Mr. Wechsler. Mr. Fredricks' deposition testimony indicated that he was very concerned with the business and economic aspects of the indemnification, asking Abella if he felt he had received adequate representation for the money, and asking the board if he could be authorized to negotiate with Mr. Bab in an effort to reduce the size of the bill. Because of the manner in which the indemnification issue was presented to the unaffiliated directors, we do not think Mr. Fredricks had any duty to independently explore the legal liability of Abella or Management--there was nothing to "sharpen his attention" indicating to him that he should not rely upon Mr. Wechsler, as counsel to the Fund, to adequately inform him as to the legal considerations relating to the indemnification. Since the testimony indicated that Mr. Fredricks did fully explore those issues that were meaningfully brought to his attention no liability will be imposed.

We further find that defendant Abella breached his fiduciary duty by failing to disclose to the unaffiliated directors that in connection with the Statements of Services Rendered dated February 11, 1972 and August 1, 1972 submitted by Kass, Goodkind there were charges for Mr. Wechsler's representation of Mr. Abella before the SEC in connection with its investigation, and that Mr. Wechsler had stated twice to the SEC investigator on the first appearance that he was representing Mr. Abella *personally* tr. at 175–176, 179. *See* tr. at 176–178 and Plaintiff's Exhibit 23, (a

copy of the time record for the August 17 SEC hearing indicated that Kass, Goodkind initially named its clients to be Abella and Management, then crossed off their names and wrote in the Fund) and Plaintiff's Exhibit 44. Defendants elicited from Mr. Powers testimony to the effect that the expenses of the Fund were presented periodically to the board for its general review, but Powers also testified that "we reviewed more annual budgets than specific expenditures" and neither he nor Galbraith recalled discussing the Wechsler bills at all. Tr. at 64–66, 123, 126. Furthermore, the minutes of the board meetings around the time of the submission and payment of the Wechsler bills do not indicate any discussion of those bills. The attorney fees, according to Mr. Wechsler's testimony, came to approximately $800, tr. at 327. We therefore find defendants Management and Abella liable for $800 plus interest in compensatory damages.

■ Finally, as to the joint trading claim, we hold that here Abella did not knowingly breach his fiduciary duty. We find that a fiduciary duty of disclosure existed. There was sufficient "simultaneous" trading here so that two potential conflicts of interest arose: first, that Abella's personal purchases may have resulted from his access to information developed by, and/or for the benefit of the Fund; second, that the Fund's purchase of some of the securities may have been influenced by Abella's personal investment in those securities. We also find that Abella failed to disclose his trading to the independent directors. We find, however, that his failure to make such a disclosure was due to his understanding that conflicts of interest did not arise when the transactions involved small purchases such as his of only a few hundred shares.

3. *Section 37 Claims*

■ Section 37 provides:

Whoever steals, unlawfully abstracts, unlawfully and willfully converts to his own use or to the use of another, or embezzles any of the moneys, funds, securities, credits, property, or assets of any registered investment company shall be deemed guilty of a crime ...

*Brown v. Bullock*, 194 F.Supp. 207 (S.D.N.Y.), aff'd 294 F.2d 415 (2d Cir. 1961) sets out the essential elements of a cause of action under Section 37 of the Act. *Brown v. Bullock* was a stockholders' derivative action against a fund, its investment adviser and various directors of the fund, including two who were also officers and directors of the adviser. The plaintiffs alleged, in part, that the fees paid to the adviser under the management agreement were excessive. Plaintiffs charged that the two affiliated directors and the adviser, "dominated and controlled" the Fund and its Board of Directors and "caused" the fund to enter into the management agreements and its yearly extensions without properly evaluating it or considering the alternatives. The plaintiffs charged the other directors with having, "participated or acquiesced" in this with "knowledge or notice of [its] wrongful character" making no effort to ascertain "whether services similar to those supplied by the Management Company could be secured elsewhere on more advantageous terms or whether the Management Company itself could not be persuaded to take less." The plaintiffs asserted that the payment of the investment advisory fees by the Fund to the adviser under these circumstances constituted "an unlawful and willful conversion" by the defendants of the Fund's moneys, property and assets to the use of the adviser in violation of Section 37 of the Act; "Gross abuse of trust, gross misconduct, willful misfeasance, bad faith, gross negligence or reckless disregard of official and contractual duties by the defendants" in violation *inter alia* of Section 36 of the Act; and state common law breach of fiduciary duty and waste of corporate assets. The trial court held that the Fund (and therefore its stockholders) had an implied private right of action under Sections 36 and 37 of the Act, 194 F.Supp. 207 at 223–228, 237–246, and that plaintiffs had stated a cause of action under both sections. *Id.* at 228–230, 247. The Court of Appeals, sitting *en banc*, dealt only with the sufficiency of the

Section 37 claim. The court agreed with appellants/defendants that "a complaint does not allege a violation of § 37 unless its substance would support an indictment" *Id.* at 419 and that defendants had to act "knowingly and wilfully" (not negligently); wilfully being defined not only as "an act done with a bad purpose" but also as "a thing done without ground for believing it is lawful or conduct marked by careless disregard whether or not one has the right so to act" (citations omitted) *Id.* at 420. The court agreed with appellees/plaintiffs that, although Section 37 was entitled "Larceny and Embezzlement", its coverage was expanded by the use in the text of the word "conversion", the court adopting the definition of "conversion" in *United States v. Morissette*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952):

... that knowing conversion was added by "codifiers of the larceny–type offense" because "gaps or crevices have separated particular crimes of this general class and guilty men have escaped through the breaches"; the lawmakers included conversion of that sort because they "wanted to reach" all instances "under which one

may obtain wrongful advantages from another's property." And, again, "Probably every stealing is a conversion, but certainly not every knowing conversion is a stealing * * * Conversion * * * may be consummated without any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful. Conversion may include misuse or abuse of property. It may reach use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use," 342 U.S. at pages 271–272, 72 S.Ct. at page 254.

The court held that, inasmuch as the complaint charged that defendants were "tools" of the adviser and that they acted in its interest rather than in the interest of the Fund, allegations that they approved payments to the adviser with knowledge that they bore no relation to the value of services rendered stated a cause of action for willful conversion. *See also: Tanzer v. Huffines*, 314 F.Supp. 189 (D.Del.1970);[6] *SEC v. Commonwealth Chemical Securities, Inc.*, 410 F.Supp. 1002 (S.D.N.Y.1976), *aff'd*, 574 F.2d 90 (2d Cir. 1978).[7] Thus plaintiff

---

6. In *Tanzer v. Huffines*, 314 F.Supp. 189 (D.Del. 1970) a stockholder of the fund alleged that various defendants, through their control of another corporation which controlled the fund, were able to infiltrate into and make themselves officers and directors of certain portfolio companies of the fund and "having gained such control, they used it to cause excessive salaries, bonuses and other emoluments to be granted themselves." *Id.* at 194. The court held that this allegation of "use of corporate funds to finance one's private scheme for gain" adequately alleged "conversion". The court further held that these allegations set out a claim under Section 36 of the Act:

The Court is convinced that the conduct described here indicates ... 'an almost flagrant disregard for the affairs of the [fund]' and that, if proven, it constitutes gross abuse of trust and gross misconduct on the part of the defendants.

*Id.* at 195 (citations omitted).

7. In *SEC v. Commonwealth Chemical Securities, Inc.*, 410 F.Supp. 1002 (S.D.N.Y.1967), *aff'd*, 574 F.2d 90 (2d Cir. 1978) the SEC brought a suit against an investment adviser and two of its principal officers and directors, Messrs. Drucker and Klienman, who were also officers and directors of two funds which had

an agreement with the adviser, and who were further affiliated with a broker–dealer, Commonwealth Chemical Securities, Inc. ["Commonwealth"] which was a "best–efforts" underwriter of securities of Beneficial Labs, Inc. ["Beneficial"]. On various occasions these two individual defendants had the funds purchase large quantities of Beneficial stock from Commonwealth at artificially inflated prices. *Id.* at 1012. The court found that this violated Section 37 of the Act:

What must be shown to constitute a violation of this statute? In *Tanzer v. Huffines*, 314 F.Supp. 189 (D.Del.1970), the court stated:

"Conversion, as used in the Act, includes misuse or abuse of property. It also includes use in an unauthorized manner or to an unauthorized extent of property placed in one's custody for limited use."

Applying that test, we conclude that the wilful misconduct of Drucker, Kleinman and Commonwealth, in using the assets of the funds in their unlawful scheme to inflate and artificially support the price of Beneficial securities and in "dumping" large blocks of these watered securities on the funds, constitutes a misuse of assets entrusted to them

must by a preponderance of the evidence prove each of the following elements: *first,* that the defendant Abella "converted" the Fund's assets; and *second,* that the defendant acted "wilfully and knowingly". We do not find defendants Abella and Management liable under this section as to the legal expenses claim, nor defendant Abella liable under this section as to the joint trading claim because plaintiff has not as to any of these defendants on any of these claims established "willfullness" as that term is defined in *Brown v. Bullock, supra.*

### 4. Section 17(d) and the Joint–Trading Claim

█ In our 1979 Memorandum Decision we indicated that we would defer decision as to whether or not plaintiff had, on the joint trading claim, an implied cause of action under Section 17(d) in light of the possibility that plaintiff might obtain complete relief under Section 36 and/or 37 of the Act where implied causes of action have repeatedly been recognized. Although we have now held that plaintiff may not recover on this claim under either of these sections we still need not decide this difficult question because assuming, *arguendo,* such a right,[8] plaintiff has failed to prove an essential element—"joint trading".

Section 17(d) provides, in relevant part:

(d) It shall be unlawful for any affiliated person of ... a registered investment company ... or any affiliated person of such a person ... acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant.

There are three elements to a Section 17(d) violation: *first,* the defendant must be "affiliated" with the Fund as that word is defined in Section 2 of the Act; *second,* the defendant, acting as principal, must have effected a transaction in which the Fund was a joint or a joint and several participant with the defendant—the phrase "joint or a joint and several participant" embraces even a loose, informal combination, *SEC v. Talley Industries, Inc.,* 399 F.2d 396, 402 (2d Cir. 1968); and *third,* the defendant must have effected this transaction in contravention of an SEC rule or regulation prescribed to limit or prevent participation by the Fund on a basis different from, or less advantageous than, that of the defendant—here the relevant SEC rule is Rule 17d 1 which requires that the joint trader have obtained prior approval from the SEC.

It is conceded that elements one and three have been shown. Mr. Abella was an officer and a director of the Fund and hence an affiliate within the meaning of section 2(a)(3)(D) of the Act. Moreover it is conceded that Abella did not obtain SEC approval for the trades he entered into. As to the second element, we hold that in light of the *de minimis* aspects of Abella's transactions his conduct cannot be said to have risen to the level of even a loose "combination" with the Fund.

### 5. Common Law

█ Plaintiff, in its complaint, pleaded not only violations of federal law but also of state common law. With respect to the legal expenses claims, plaintiff alleged common law waste and misappropriation of cor-

---

sufficient to violate Section 37 of the Investment Company Act.

*DK & B.*

DK & B, as investment advisor to the funds, was used by Drucker and Kleinman in their unlawful scheme to defraud. We conclude, therefore, that DK & B violated ... [*inter alia*] Section ... 36(a) and 37 of the Investment Company Act.

*Id.* at 1019.

**8.** Although there is dicta to the effect that such a private remedy may exist, *see SEC v. General Time Corp.,* 407 F.2d 65, 70 (2d Cir. 1968). *See also Leist v. Simplot,* 638 F.2d 283 (2d Cir. 1980).

porate assets. In light of our holding that defendant Fredricks is not liable under standards at least as stringent as those imposed under common law, *Tannenbaum v. Zeller, supra* at 416, n.20; in light of the fact that liability has, in any event, been imposed on Abella and Management under federal law; and in light of the fact that neither party dealt with the common law issue either in their papers or in oral argument, we do not reach that issue.[9] We do reach the common law allegations with respect to the joint trading claim and, for the reasons set forth below, we hold defendant Abella liable to the Fund under Delaware common law for all profits received by him on the securities transactions listed on Defendants' Exhibit BB.

We find, from the evidence, that the Abellas' decision to purchase the securities was the result of Mr. Abella's access to information developed by, and for the benefit of, the Fund. Mr. Abella was portfolio manager of the Fund when the Fund began purchasing Sierra securities and as portfolio manager, Mr. Abella's duties included analyzing corporations to ascertain whether the purchase of their securities should be recommended to the Fund by the adviser. P.T.O. ¶ 9. The parties further stipulated that Mr. Abella had conducted research and obtained information for the Fund on the gold mine securities and MPB. P.T.O. ¶¶ 56–58. We find that the relationship between the dates of the Fund and the Abella transactions, and with respect to the South African gold mining securities the proximity of the date of the Abella meeting with Tehan to the individual purchase of the securities, as strong circumstantial evidence that Abella used information developed by the Fund for his own personal benefit. Mrs. Abella's testimony that she independently made the decision to purchase or sell these securities based upon her own research and her own interest in gold,

completely unaware of the fact that the Fund was simultaneously making such purchases, was simply not credible. Mrs. Abella's testimony on this issue, particularly on cross–examination was vague, evasive and contradictory. *See, e. g.,* tr. at 667; 681, lines 17–20; 689 lines 16–19; 692 lines 13–696, line 18; 698, line 25–699 line 15; 705 line 14–706 line 13; 707, line 5–708 line 18; and 710 line 6–712 line 4. Mr. Abella's attempted explanation for the coincidence of purchase dates was similarly unpersuasive. Tr. at 1098–1099.

In *Gottlieb v. McKee,* 34 Del.Ch. 537, 107 A.2d 240 (1954), the Delaware court held:

Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests. While technically not trustees, they stand in a fiduciary relationship to the corporation and its stockholders. The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self–interest. If an officer or a director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation and its directors while it denies to the betrayer all benefit and profit.

*Id.* 107 A.2d at 243. *See also: Diamond v. Oreamuno,* 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) ("It is well established, as a general proposition, that a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom." *Id.* 301 at 80, 248 N.E.2d at 912.) Therefore defendant Abella is lia-

---

9. We note however, that in the recent Second Circuit decision in *Lewis v. S. L. & E., Inc.,* 629 F.2d 764 (2d Cir. 1980) where the claim of waste was raised under New York law the Court held that there are "special rules for scrutiny of a transaction between the corporation and an entity in which its directors are directors or officers or have a substantial financial interest" *id.* at 769. This may very well be the law in Delaware as well. *See:* 3 Fletcher, *Cyclopedia of the Law of Private Corporations* § 921 (perm. ed. 1975) and *Abbey v. Control Data Corp.,* 603 F.2d 724, 727 (8th Cir. 1979).

ble to plaintiff for $5,047.10 of realized profits, and for $5,739.39 of unrealized profits.[10]

## II. DEFENDANTS' CROSSCLAIM AND COUNTERCLAIMS

The Abella defendants have asserted a crossclaim against defendant Fredricks "should any liability or recovery against the Abella defendants, or any one of them, arise by reason of the allegations of the First Count of the Complaint". Abella Defendants' Answer ¶ THIRTY–SECOND. We find no basis for this crossclaim and it is therefore dismissed.

The Abella defendants have also asserted a counterclaim seeking indemnification "as a matter of right" for expenses incurred in this action. Defendants claim they are entitled to recovery under New York Business Corporation Law § 722(a) and the Delaware Corporation Law § 145(b) and (c). In light of our findings on Counts One, Four and Five, we hold that the Abella defendants are not entitled to indemnification on these counts under either statute. The Abella defendants have been "successful on the merits or otherwise" in defending on Counts Two, Three and Six. Defendants moved on October 14, 1977 for indemnification on Count Three and for an advance on litigation expenses. That motion was granted by memorandum endorsement on January 31, 1978 "to the extent of $6,500.00 subject to an appropriate undertaking by defendant Abella". We think that this sum is adequate indemnification for the Abella defendants for all expenses incurred in the successful defense of Counts Two, Three and Six, see Bab affidavit of August 16, 1979, ¶ 6, and defendants are awarded that sum.

The Abella defendants have also interposed a counterclaim for costs alleging that plaintiff prosecuted this case in bad faith. In *Nemeroff v. Abelson*, 620 F.2d 339 (2d Cir. March 17, 1980), the Second Circuit reiterated the requirements for finding "bad faith" in this Circuit: there must be "clear evidence" that the claims are "entirely without color *and* made for reasons of harassment or delay or for other improper purposes." *Id.* at 348 *quoting from Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, at 1088 (2d Cir. 1977). The court further held that "A claim is colorable, for the purpose of the bad faith exception, when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim. The question is whether a reasonable attorney could have concluded that facts supporting the claim *might be established*, not whether such facts actually *had been established*." *Id.* We find here, as we found in our 1979 Memorandum Decision, that there was a factual and legal basis for Counts One, Four and Five. *See also: Lewis v. S. L. & E., Inc.*, 629 F.2d 764, 773 (2d Cir. 1980). Nor do we find bad faith, under the stringent standards set out in *Nemeroff, supra*, as to Counts Two, Three or Six.

The Abella defendants have finally interposed a counterclaim for damages alleged to have been caused to their professional reputation and standing by the bad faith institution and prosecution of this lawsuit by plaintiff. Our prior holding undermines the factual predicate for this claim even if defendants could assert a claim for "prima facie tort" under these circumstances.

## III. CONCLUSION

We therefore hold that plaintiff may recover $13,463 with interest from defendants Management and Abella and $800 with interest from defendant Abella on the legal expenses claims and $10,786.49 with interest on the $5,047.10 realized profits from defendant Abella on the joint–trading claim.

---

**10.** From Plaintiff's Exhibits 84 and 85 it appears that the Abella defendants, as of the last week in July, 1979 had an unrealized profit in Camflo of $1,419.92, (250 shares–purchased for $1,798.83, most recent bid price at 12⅞ or $3,218.75); Valreefs of $1,855.55 (100 shares– purchased for $1,494.95, most recent bid price of 33½ or $3,350); MPB of $929.42 (105 shares–purchased for $1,485.58, most recent bid price at 23 or $2,415); Sierra of $1,535 (300 shares–purchased for $1,090, most recent bid price at 8¾, or $2,625).

Mr. Abella on his indemnification counter-claim is released from his undertaking for the $6,500 and is awarded that sum as indemnification. Plaintiff's claims against defendant Fredricks are dismissed and Fredricks' request for costs granted. Defendant Capital was, by consent of the parties, dropped from this action, tr. at 11, 16–17.

Plaintiff is to submit judgment within 10 days.

SO ORDERED.