107 F.3d 4
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
In re PRUDENTIAL SECURITIES INC. LIMITED PARTNERSHIP LITIGATION,
Matt NILSON, David Matus, Melinda Matus, Leslie
Bishofberger, Dorothy Bishofberger, Thomas Barrett, James M.
Barrett, Rebecca Barrett, Executrix of the Estate of James
Barrett, Carl Roba, Jay Jablonski, Vincent Lazara, and
Jeffrey A. Schiller, Movants-Appellants,
v.
PRUDENTIAL SECURITIES INC., Respondent-Appellee.
John D. TOLAND and Christal Toland, as husband and wife and
d/b/a The John Toland Company, MacDaniel Jackson,
Miriam Jackson, Plaintiffs-Appellants,
v.
In re PRUDENTIAL SECURITIES INC. LIMITED PARTNERSHIP
LITIGATION, Defendant-Appellee.
 MDL No. 1005.
Nos. 95-9209 L, 96-7277 C, 96-7197 C, 96-7159 C, 96-7147 C,
96-7199 C, 96-7235 C.
 United States Court of Appeals,
 Second Circuit.
 Dec. 27, 1996.
 
 APPEARING FOR MOVANTS-APPELLANTS AND PLAINTIFFS-APPELLANTS:
 APPEARING FOR RESPONDENT-APPELLEE PRUDENTIAL SECURITIES, INC.:
 APPEARING FOR RESPONDENT-APPELLEE CLASS PLAINTIFFS: SETH LIPNER, Deutsch & Lipner (Paula Schwartz Frome, Jerome Ferguson, Neil Chamberlin, Archibald M. Mull III, on the brief), Garden City, NY.
 THOMAS J. KAVALER, Cahill Gordon & Reindel (Mathias E. Mone, John M. McSherry on the brief), New York, NY.
 LAWRENCE A. SUCHAROW, Goodkind Labaton Rudoff & Sucharow, New York, NY.
 S.D.N.Y.
 AFFIRMED.
 Before VAN GRAAFEILAND, JACOBS, CALABRESI, Circuit Judges.
 Appeal from the United States District Court for the Southern District of New York (Pollack, J.).
 
 
 1
 This cause came on to be heard on the transcript of record from the United States District Court for the Southern District of New York, and was argued by counsel.
 
 
 2
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgments of the district court are AFFIRMED in all respects.
 
 I. Background
 
 3
 These consolidated appeals are taken from a series of orders denying the appellants' motions, pursuant to Fed.R.Civ.P. 6(b) and 60(b), to enlarge their time to opt out of a class action settlement, or for relief from the final judgment, for excusable neglect. Although the facts and governing legal principles vary, all of the appellants were pursuing or wish to pursue arbitration remedies against the class action defendant, and by virtue of the orders appealed from are now enjoined from pursuing arbitral remedies, or indeed any recovery other than pursuant to the class action settlement.
 
 
 4
 In May 1994, several class actions against Prudential Securities, Inc. (PSI) were consolidated in the Southern District of New York (Pollack, J.). The plaintiffs filed a consolidated complaint in June 1994, in which they asserted RICO and common law claims arising out of fraud by PSI in the organization, marketing, sale, and operation of over 700 partnerships sold during the 1980s.
 
 
 5
 The settlement reached in August 1995 provided inter alia that PSI would pay $110 million into a settlement fund for the benefit of the class, and that PSI would be released from:
 
 
 6
 any and all claims, rights or causes of action or liabilities whatsoever ... including both known and unknown claims, that have been, could have been, or in the future might be asserted in any forum by the Class Members or any of them or the successors and assigns of any of them, whether directly, indirectly, representatively, derivatively or in any other capacity, against any of the Released Parties [including PSI], in connection with or which arise out of or relate in any way to the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth or referred to in the Consolidated Complaint, or which relate in any way to the marketing, purchase, sale or holding of ... any of the Partnerships during the Class Period.
 
 
 7
 The settlement also included a so-called "blow provision," which provided that if class members asserting in the aggregate more than $10 million in claims opted out of the class by the opt out deadline, PSI had the right to withdraw from the settlement.
 
 
 8
 Notice of the settlement was mailed to approximately 275,000 class members in early October 1995. The notice stated that the opt out deadline was October 30, 1995, and warned:
 
 
 9
 If you have pending your own claim or action against any person or entity in connection with an investment in any of the Partnerships (as defined [therein], you should consult with the attorney representing you, as this Consolidated Action, the certification of the Class, the proposed partial settlement, and this Notice may affect your claim or your action....
 
 
 10
 THE RELEASE TO BE GIVEN TO THE PSI SETTLING DEFENDANTS AND THE RELEASED PARTIES IS VERY BROAD AND MAY IMPACT UPON OTHER RIGHTS OR CAUSES OF ACTION YOU MAY HAVE.
 
 
 11
 Summary notice was published twice in the national editions of the New York Times, the Wall Street Journal, and USA Today. The 10,926 people who responded to the published notice received the full notice by mail.
 
 
 12
 By the October 30 deadline, opt outs had been filed by class members having claims that exceeded $10 million dollars. PSI therefore had the right, under the blow provision, to walk away from the settlement, and had until November 16, 1995, to make that election. PSI declined to exercise its right to abandon the settlement, and the court proceeded to a fairness hearing on November 17, 1995.
 
 
 13
 On November 20, 1995, the district court entered a final judgment: 1) certifying a settlement class, 2) approving the settlement, 3) dismissing all settled claims by class members against the released parties on the merits and with prejudice, and 4) enjoining class members from instituting, commencing, or prosecuting any action or proceeding regarding any of the settled claims against any of the released parties.
 
 
 14
 After the entry of final judgment, the district court addressed a series of motions under Fed.R.Civ.P. 6(b) and 60(b) for relief from the final judgment and for permission to opt out belatedly. In four instances, the district court invited PSI to reconsider its opposition to the motions. As to those four claimants, PSI withdrew its opposition and allowed them to opt out. The district court denied the remaining motions, and this appeal followed.
 
 I. Discussion
 
 15
 On a motion for a late opt out, a district court must determine 1) whether the movant's neglect was excusable, and 2) whether either party would be substantially prejudiced by the court's action. See Supermarkets General Corp. v. Grinnell Corp., 490 F.2d 1183, 1186 (2d Cir.1974) (per curiam). This determination rests within the district judge's discretion, and we reverse only for abuse of that discretion. Id.
 
 
 16
 PSI claimed prejudice based on its expectation of finality, arguing that PSI had bargained for and paid $110 million for finality and repose that would be defeated or diminished by late opt outs. The appellants argue that PSI is not prejudiced, because their delay did not impair PSI's ability to exercise its election under the blow provision. They also contend that the prejudice to each appellant by denying the late opt outs far outweighs the prejudice to PSI of having to pay out an additional two or three million dollars in addition to the $110 million settlement.
 
 
 17
 Although PSI was free to make its election under the blow provision--the $10 million floor having been reached--PSI made its decision to proceed with the settlement in part on the basis of how many claims of what estimated value would remain. Therefore, PSI is (at least marginally) prejudiced by additional, late opt outs, because such late claims increase the liability exposure that the settlement was intended to limit.
 
 
 18
 We think that PSI's prejudice argument has some force, and that the district court did not err in deciding that each motion granted would cause some prejudice to PSI, and should therefore be evaluated in light of that background assumption.
 
 A. Matt Nilson
 
 19
 Matt Nilson invested $284,754 in partnerships. In June 1993, he initiated an arbitration against PSI. Hearings were held in December 1994; the arbitration was then adjourned until January 1995, and later rescheduled for December 1995 at PSI's request.
 
 
 20
 Nilson's office staff received notice of the class action on or around October 23, 1995, one week before the opt out deadline of October 30. When the notice was received, Nilson himself was travelling abroad, and was scheduled to return for the arbitration hearings in early December. His staff, under the mistaken belief that no action need be taken until December 15, 1995, did not contact Nilson or his attorney. No opt out was timely filed.
 
 
 21
 On November 7, 1995, after the opt out deadline, PSI contacted Nilson's lawyer to find out whether Nilson had opted out. Informed that Nilson had not done so, PSI stated its intention to move for a stay of arbitration. On November 8, 1995, Nilson's counsel--who had timely opted other clients out of the class--sent a request for exclusion to the claims administrator.
 
 
 22
 On November 16, 1995, Nilson moved for permission to file an untimely exclusion request, so that he could continue his individual arbitration. The district court denied the motion at a hearing on November 29, 1995, emphasizing that Nilson's attorney had timely opted out on behalf of another client, and that the failure to opt out on Nilson's behalf could therefore be construed as a deliberate choice.
 
 
 23
 We conclude that the district court did not abuse its discretion in denying Nilson's request for a late opt out. Regardless of what Nilson's lawyer may or may not have done on behalf of other clients, Nilson failed to demonstrate that his own neglect was excusable: notice was timely sent to his office, which simply ignored it. Nilson's pending arbitration does not excuse his failure to opt out. The release (provided as a part of the notice) cautioned that anyone who had "pending your own claim or action against any person or entity in connection with an investment in any of the Partnerships" should check with a lawyer to determine whether that action would be affected. Nilson, or those he entrusted with his affairs while he was out of the country, chose not to do so.
 
 B. The Matuses
 
 24
 David and Melinda Matus invested $93,000 in PSI partnerships, and initiated a NYSE arbitration against PSI in April 1994. They received the class action notice on October 21, 1995, but did not inform counsel or respond, apparently believing that no action was necessary.
 
 
 25
 Arbitration hearings in San Diego continued from October 25th to the 27th, 1995. PSI participated without requesting a stay. On October 30, 1995, on the ground of witness unavailability, PSI requested an adjournment until December 1995. The opt out date was not mentioned during the arbitration proceedings. On November 7, PSI called the Matuses' attorney to find out whether they had opted out by the deadline. Advised that they had not, PSI stated its intention to move for a stay. On November 9, the Matuses' counsel--who had timely opted out on behalf of other clients in the class--sent an opt out request to the claims administrator.
 
 
 26
 On November 16, 1995, the Matuses--along with Nilson--moved for permission to file an untimely exclusion request, in order to proceed with their individual arbitrations. As with Nilson, the district judge noted that the Matuses' attorney had timely opted out other clients, and concluded that the Matuses had made a deliberate choice to remain a part of the class. The motion was therefore denied on November 29, 1995.
 
 
 27
 We conclude that the district court did not abuse its discretion in finding that the Matuses had not demonstrated excusable neglect. Whether or not the failure of the Matuses' counsel to opt out on their behalf supports an inference of deliberate choice, the notice expressly stated that potential class members who had "pending [their] own claim or action against any person or entity in connection with an investment in any of the Partnerships" should check with their lawyer. The Matuses, so warned, did nothing to protect their rights. We cannot say that the district court's denial of their motion was an abuse of discretion.
 
 C. The Jacksons
 
 28
 MacDaniel Jackson, a former Dallas employee of PSI, invested $300,000 in partnerships. In November 1994, Jackson and his wife moved to North Carolina. Mr. Jackson advised PSI of his address change orally and in writing. On January 12, 1995, Mr. Jackson filed an arbitration proceeding regarding both his investment in partnerships as well as the loss of $100,000 in life insurance policies that allegedly had been churned by Prudential Insurance.
 
 
 29
 PSI sent notice of the class action to Mr. Jackson in care of PSI's Dallas office. A employee in PSI's Dallas office stated by affidavit that it was his common practice to forward mail to Mr. Jackson the day it was received or the next day, and that he had not withheld forwarding the class notice. Mr. Jackson's affidavit indicates that he did not receive the forwarded notice until December 7, 1995. On or about the same date, the Jacksons' counsel received a letter from PSI demanding that the Jacksons dismiss their arbitration proceeding.
 
 
 30
 The Jacksons moved to be excluded from the class in order to proceed with their individual arbitration claim, arguing that PSI's failure to provide the claims administrator with the proper address constituted sufficient grounds for extraordinary relief.
 
 
 31
 At the January 18 hearing, the district court denied the Jacksons' motion, noting that "I almost had the impression ... that [Mr. Jackson] maybe caught himself after this thing after sitting on his duff after delaying letting you know about it before."
 
 
 32
 As the movants, the Jacksons had the burden of proof as to excusable neglect. The district court has evidently inferred from the affidavit of the PSI employee in Dallas that timely notice was sent, and has expressed skepticism concerning Jackson's claim that he did not receive notice until the deadline had expired. There has been no abuse of discretion.
 
 D. The Tolands
 
 33
 Christal Toland, now deceased, and her husband John purchased a $450,000 interest in PSI's Energy Income Fund Partnerships. The Tolands were originally members of a class of purchasers in In Re Prudential-Bache Energy Income Partnerships Securities Litigation, MDL No. 888, a multi-district class action in the United States District Court for the Eastern District of Louisiana (Livaudais, J.) (the "Louisiana class action"). However, the Tolands received notice of a proposed settlement of the Louisiana class action in January 1993, and timely opted out of that class.
 
 
 34
 In June 1993, the Tolands filed an arbitration with the American Arbitration Association. The original respondents in that arbitration included PSI and its parent company, Prudential Insurance Company of America ("PI"). In September 1993, the Tolands and the two Prudential respondents agreed that: the Tolands would dismiss PI from the arbitration and would not attempt to compel it to arbitrate in the future; and in return, the remaining respondents--including PSI--would "voluntarily submit to and [ ] remain parties" in the arbitration to its resolution. Tolands' counsel confirmed that PSI and the other non-PI respondents were "expected to remain viable and available for the resolution of any judgment which should result from the arbitration proceedings."
 
 
 35
 Thereafter, the following events unfolded: the original settlement of the Louisiana class action was rejected by the Eastern District of Louisiana; a second settlement was reached, which was approved in February 1994; notice of the second settlement was sent out ten days after PI was dismissed from the Tolands' arbitration; Mr. Toland did not receive the notice of the second settlement; neither he nor his counsel submitted a new opt out form.
 
 
 36
 In the meantime, the Tolands' arbitration continued, they spent approximately $100,000 on it, and no mention was made of the Louisiana settlement. In July 1995, the claims administrator in the Louisiana class action sent Mr. Toland a settlement check. The Tolands' counsel returned the check, explaining that the Tolands were in arbitration by agreement with PSI.[1]
 
 
 37
 The terms of the New York settlement excluded the members of the Louisiana class. Presumably because the Tolands did not opt out of the second Louisiana class settlement, they were recorded as members of the Louisiana class, and no notice of the New York class action settlement was sent to them. Class counsel verified that the Tolands' names were not provided to the administrators, and the notice administrators confirmed that they sent no notice to the Tolands. The Tolands claim that their first notice of the New York class action was PSI's motion before the arbitral panel on November 30, 1995--one month after the opt out deadline--to stay the arbitration based on the final order of the district court. The panel stayed the arbitration, and the Tolands moved for a late opt out.
 
 
 38
 In mid-October 1995, at the arbitration, PSI's lawyer asked whether the Tolands had received notice of the New York class action. According to his affidavit, PSI's lawyer proceeded to tell the Tolands' lawyer about the Tolands' membership in the class and about the opt out deadline.
 
 
 39
 At the January 18 district court hearing in New York, the Tolands' attorney could not recall the particulars of that conversation, but did remember that PSI's arbitration lawyer provided the telephone number of an in-house PSI lawyer. He went on to say that he did not follow up on the conversation, but rather operated on the assumption that the Tolands would have received notice if they were class members.
 
 
 40
 The district court's denial of the Tolands' motion was not an abuse of discretion. The fact that they were omitted from the mailing list is not determinative, because publication notice was afforded and in any event, their attorney received personal notice two weeks before the opt out deadline.[2] Judge Pollack need not have found that the failure of their attorney to respond to inquiry notice constituted excusable neglect, and he did not abuse his discretion by refusing to do so. See Nemaizer v. Baker, 793 F.2d 58, 62 (2d Cir.1986). PSI's agreement with the Tolands to arbitrate their dispute to its conclusion does not alter this result; the Settlement Agreement provided and the notice clearly and frequently indicated that the release was extremely broad and applied to all currently-pending claims against PSI regarding the partnerships, without exception.
 
 E.Carl Roba
 
 41
 Carl Roba was a broker with PSI who purchased partnerships from the firm during the period of his employment. After he was fired, he filed an arbitration proceeding against PSI alleging wrongful termination and interference with contract, relating to his sale of partnerships.
 
 
 42
 Roba's notice of the class action was misaddressed, but he received it anyway. Even so, he believed that the settlement would only foreclose claims for partnership losses, which he was not asserting, and would not affect his arbitration, which was concerned only with Roba's employment claims. He did not timely opt out.
 
 
 43
 Roba, along with other PSI brokers (considered individually below) contended in a joint motion that the class representation was inadequate as to their employment claims, because none of the named plaintiffs were brokers having employment claims; consequently, they argue that their claims were bargained away without compensation. At the January 18 hearing, the district court ruled that the adequacy or inadequacy of the class representatives and class counsel was an issue for the fairness hearing, and was not an issue that bears on the motion to extend the opt out date.
 
 
 44
 The denial of Roba's motion was not an abuse of discretion. The notice expressly stated that the release was very broad, including any claims "in connection with or which arise out of or relate in any way to the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth or referred to in the Consolidated Complaint, or which relate in any way to the marketing, purchase, sale or holding of ... any of the Partnerships during the Class Period," and that anyone who had purchased partnerships should consult an attorney. As it happens, many brokers who were pursuing employment claims did opt out, precisely to avoid the ramifications of the broad release.
 
 F. Vincent Lazara
 
 45
 Vincent Lazara and Jay Jablonski (considered separately below) were PSI brokers who left to work for the Smith Barney firm. Both had purchased partnerships while PSI employees.
 
 
 46
 Partnerships sold by Lazara and Jablonski became the subject of arbitration proceedings brought by customers. In 1991 and 1992, PSI lost some of these arbitration proceedings and settled some others. At that time, PSI filed Form U-5s with the SEC reporting that Lazara and Jablonski had committed wrongdoing with respect to those customers. As a result, the brokers were fired by Smith Barney, have been unable to find other employment, and commenced arbitration proceedings against PSI regarding the information provided on the U-5s.
 
 
 47
 Lazara moved in 1991, and sent word of his change of address to PSI. Notice of the class action, however, was sent to Lazara's former address; he never received it. PSI's mailing list was compiled from three sources, one of which was PSI's direct investment group mailing list. Apparently Lazara's address was not corrected on that particular list. Lazara's first notice of the class action was November 30, 1995, when PSI demanded that the arbitration be dismissed. He did not timely opt out.
 
 
 48
 Lazara participated in the joint brokers' motion for a late opt out, which was denied on January 18.
 
 
 49
 The denial of the motion as to Lazara was a tough (as opposed to an indulgent) exercise of discretion, but we cannot say that discretion was abused. Non-receipt of mailed notice does not render the notice flawed. See Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir.1988). Lazara could have obtained notice from any of the published sources or the widespread media coverage of the settlement. It was not an abuse of discretion for Judge Pollack to determine that--even assuming that Lazara's neglect was excusable--the prejudice to PSI, and the prejudice to the settlement process when the opt outs are considered in the aggregate, outweighed the prejudice to Lazara. See Grinnell, 490 F.2d at 1186.
 
 G. Jay Jablonski
 
 50
 Jablonski, like Lazara, was a PSI broker who went to work for Smith Barney. Notice of the class action was sent to an incorrect address, although PSI apparently had notice of his address change. Jablonski did not receive notice prior to the opt out deadline, and he did not timely opt out.
 
 
 51
 Previously, because of customer complaints regarding his recommendations of partnership interests, Jablonski had paid $12,500 to the State of Arizona through a consent decree. Jablonski argues that by virtue of the Arizona fine, he is not properly a member of the class, because the class definition excludes:
 
 
 52
 (iv) any person who has been determined ... by any court of regulatory authority ... to have violated any law, rule, or regulation, or committed any wrongdoing, in connection with or relating to the marketing, purchase, sale, or holding of ... the Partnerships.
 
 
 53
 At the January 18 hearing, the district court ruled that Jablonski was a class member.
 
 
 54
 The issue is whether (in the words of the exclusion) Jablonski has been "determined" to have committed any wrongdoing. In other contexts, Jablonski has taken the position that the Arizona decree, because it was entered on consent, "determined" nothing. Judge Pollack commented that Jablonski was both trying to assert wrongdoing in order to be excused from the class and to reserve the ability to argue at his arbitration against PSI that he was duped into selling the partnerships.
 
 
 55
 We conclude that the district court did not abuse its discretion by ruling that the Arizona consent decree, and the fine imposed pursuant to it, did not constitute a "determination" for the purposes of the class exception, particularly because a consent decree does not result in an adjudication against the consenting party. See Cambridge Fund, Inc. v. Abella, 501 F.Supp. 598, 617 (S.D.N.Y.1980) (citing Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir.1976)).
 
 H. James Barrett
 
 56
 James Barrett, now deceased, was a PSI broker. His brother Thomas bought partnerships,[3] but was not a PSI employee. At the time of the settlement, the Barretts were co-plaintiffs in an arbitration against PSI. James Barrett had also brought a separate arbitration proceeding against PSI, alleging both age and handicap discrimination claims as well as claims arising out of his sale of partnerships. J.A. 739, 1050. As a result of a PSI input error, James Barrett was omitted from the settlement mailing list and did not receive notice, although Thomas did. The Barretts' attorney believed that James was not a class member, and did not timely submit an opt out form on his behalf. James Barrett's motion to opt out late was denied with the other brokers' on January 18.
 
 
 57
 The notice published in three major newspapers--and received by James Barrett's brother--indicated that the release was very broad. Despite the lack of mailed notice, the Barretts' attorney knew of the class action and settlement, and could have followed up on it. There was room for the exercise of discretion in favor of James Barrett, but we think that the denial of the motion was not an abuse of discretion. The injunction barring claims released in the settlement does not bar James Barrett's discrimination claims, which he apparently remains free to pursue, as PSI advised in a letter dated December 1, 1995.
 
 I. Jeffrey Schiller
 
 58
 Jeffrey Schiller sold partnerships for PSI. Having been told by PSI that ownership of the product was a good "sales tool," Schiller bought partnerships for himself as well.
 
 
 59
 Schiller was the only PSI broker to be indicted for securities fraud in connection with the sales of partnerships. The indictment was dismissed a year later, but it cost Schiller four years of income, as well as legal fees.
 
 
 60
 After dismissal of the indictment, Schiller filed an action against PSI alleging, inter alia, fraud and breach of contract, arising out of his employment, indictment, and his small partnership purchases. At PSI's request, the action was stayed in favor of arbitration.
 
 
 61
 Schiller did not receive notice of the class action until after the opt out date. His attorney was also unaware of the class action, and did not represent any other clients regarding the partnerships.
 
 
 62
 On November 3, 1995, PSI's attorney in the arbitration requested an adjournment of PSI's time to answer until 1996. She did not mention the existence of the class action, the settlement, or the impending fairness hearing. In late November 1995, Schiller received a class action notice, and on November 30, 1995, Schiller's lawyer received a letter demanding the dismissal of the proceedings because of the settlement.
 
 
 63
 Upon receipt of the notice, Schiller's lawyer called the claims administrator to ascertain the effect of the settlement on Schiller's claims. Counsel was told that the "employment" claims would be unaffected by the settlement (sound advice for anyone who had been an employee but not a purchaser). Thereafter, Schiller filed no claim in the class action, but discontinued his arbitration claims regarding the partnership purchases.
 
 
 64
 At the January 18 hearing, Schiller's counsel stated that Schiller had not received notice until after the opt out period had passed. The Court found that Schiller was a class member, and denied his motion for a late opt out, noting that Schiller was "in the middle" of the events leading to the settlement.
 
 
 65
 It was not an abuse of discretion for the district court to deny Schiller's motion. The evidence is consistent with timely dispatch of Schiller's notice, even though Schiller received it late. Moreover, notice was given via publication, and the settlement received extensive publicity in the media. Judge Pollack's reference to Schiller's being "in the middle" of these events is a polite reference to, inter alia, the fact that Schiller was the sole broker indicted as a result of the fraudulent partnerships. The district court was free to find that Schiller knew: that a settlement had been achieved; that he (as a purchaser of the Partnerships) was a part of it; and that the release was potentially broad enough to affect employment claims arising out of the transactions that were the subject of the class action.
 
 J. Leslie and Dorothy Bishofberger
 
 66
 The Bishofbergers bought $266,000 in partnerships. Early in 1995, they received a notice that the SEC had settled its proceeding with PSI and that the settlement afforded a separate avenue (leading to arbitration) for claims by dissatisfied customers. That claims mechanism, called the Expedited Dispute Arbitration Program ("EDAP"), was set up by the SEC, and is wholly independent of the claims procedure that was later established under the New York class action settlement.[4] The Bishofbergers elected to pursue the EDAP procedures. They filled out the form and sent it to their former PSI broker (who by then was no longer employed by PSI) for submission to the EDAP, but the broker did not forward the form to the EDAP administrator, because he was hospitalized with a heart attack.
 
 
 67
 The Bishofbergers received timely notice of the class action settlement in late September 1995. The notice specified, however, that those who had elected the EDAP were not class members. The Bishofbergers, who thought at first that they were not class members because they were in EDAP, called their former broker, and learned then that he had been ill and could not remember what he had done with their EDAP form. The Bishofbergers thus sent a new EDAP form on October 16, 1995, but did nothing at that time regarding the class action.
 
 
 68
 Two weeks later, a PSI employee called to ask the Bishofbergers why their EDAP form was late. They explained the situation to him, and he told them to do nothing while they awaited a ruling as to their late claim. They did nothing, which also meant that they did not file the opt out form in the New York class action. On November 11, 1995, they received a rejection of their request to participate in the EDAP. With the rejection was a recommendation--from the PSI employee with whom they had spoken--that their claim be dismissed as untimely.
 
 
 69
 The Bishofbergers, preferring industry arbitration to the class action settlement, moved to be allowed to opt out late. Judge Pollack denied the motion and held that the Bishofbergers were class members and bound by the settlement.
 
 
 70
 The district court did not abuse its discretion in denying the Bishofbergers' motion. The Bishofbergers received timely notice of the class action, and could easily have opted out of the class before the deadline. That was the prudent and obvious thing to do, particularly because they knew that their EDAP form had been untimely filed and they might well be class members. Their situation was unusual, but that is all the more reason they should not have ignored the warning on the notice that they should consult an attorney with any questions.
 
 
 71
 For the reasons set forth above, the judgments of the district court are AFFIRMED.
 
 
 
 [1]
 Throughout this litigation, the Tolands have consistently argued that they opted out of the Louisiana class action. They also moved this Court for permission to apply to Judge Livaudais regarding that class action. That motion was denied
 
 
 [2]
 The Tolands might have argued that they never opted out of the Louisiana class, that they were therefore never members of the New York class, and that the New York judgment cannot bar them from going forward with their arbitration; but that argument might have resulted in the same bar being imposed by the Louisiana settlement. Instead, the Tolands have consistently maintained that they opted out of the Louisiana class action, which places them squarely into the New York class
 
 
 [3]
 Thomas Barrett is listed as an appellant in this appeal, but (according to his attorney at oral argument) has chosen not to pursue his appeal
 
 
 [4]
 In addition to the various class actions filed against PSI with regard to the partnerships, the SEC investigated PSI. PSI and the SEC entered a consent decree on October 21, 1993, under which PSI agreed to provide a limitless fund to settle claims. PSI agreed to waive all statutes-of-limitations defenses against investors who submitted claims through the EDAP
 Eligible investors submitted their claims to PSI, who either made an offer or rejected the claim. Dissatisfied or rejected investors could pursue their claims elsewhere or enter the EDAP. EDAP decisions were binding. Investors who were members of previously certified classes or PSI employees were not eligible.